# 14-2250-cv

*To Be Argued By*:
ROSS E. MORRISON

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

LANDON ROTHSTEIN, Individually and on behalf of all others similarly situated, ROBERT DAVIDSON, IHOR KOBRYN, individually and on behalf of all others similarly situated, JENNIFER DAVIDSON,

*Plaintiffs-Appellees,*

—v.—

BALBOA INSURANCE COMPANY, NEWPORT MANAGEMENT CORPORATION, MERITPLAN INSURANCE COMPANY,

*Defendants-Appellants,*

GMAC MORTGAGE, LLC, formerly known as GMAC MORTGAGE CORPORATION, GMAC INSURANCE MARKETING, INC., DBA GMAC AGENCY MARKETING, JOHN DOES 1-20, ALLY FINANCIAL, INC., FKA GMAC, INC., ALLY BANK, FKA GMAC BANK, JOHN DOE CORPORATION, PRAETORIAN INSURANCE COMPANY, QBE FIRST INSURANCE AGENCY, INC., QBE INSURANCE CORPORATION, QBE SPECIALTY INSURANCE COMPANY,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS

---

*Of Counsel*:

JOHN C. ENGLANDER
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

ROSS E. MORRISON
BUCKLEYSANDLER LLP
1133 Avenue of the Americas,
  Suite 3100
New York, New York 10036
(212) 600-2315

ROBYN C. QUATTRONE
KATHERINE L. HALLIDAY
BUCKLEYSANDLER LLP
1240 24th Street N.W., Suite 700
Washington, DC 20010
(202) 349-8000

*Attorneys for Defendants-Appellants*

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Petitioner Balboa Insurance Company states that BA Insurance Group, Inc. is its

immediate corporate parent.  NB Holdings Corporation is the immediate parent

corporation of BA Insurance Group, Inc.  Bank of America Corporation is the

immediate parent corporation of NB Holdings Corporation.  Bank of America

Corporation is a publicly-held company whose shares are traded on the New York

Stock Exchange.  It has no parent company and no publicly-held company owns

more than ten percent of Bank of America Corporation's shares.

Petitioner Meritplan Insurance Company states that it is a wholly-owned

subsidiary of Balboa Insurance Company.

Petitioner Newport Management Corporation states that QBE FIRST

Insurance Agency, Inc. is its immediate corporate parent.  QBE Financial

Institution Risk Services, Inc. (d/b/a QBE FIRST), is the immediate corporate

parent of QBE FIRST Insurance Agency, Inc.  QBE Holdings, Inc. is the parent

corporation of QBE Financial Institution Risk Services, Inc.  QBE Insurance

Group Limited is the corporate parent of QBE Holdings, Inc.  QBE Insurance

Group Limited is a Group Holding Company listed on the Australian Securities

Exchange.  The substantial shareholders of QBE Insurance Group Limited, as of

January 31, 2013, are:  Aberdeen Asset Management PLC (and its associated

entities), HSBC Custody Nominees (Australia) Limited, JPMorgan Nominees Australia Limited, and National Nominees Limited.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement ....................................................................................1

Jurisdictional Statement ..............................................................................5

Issue Presented for Review ..........................................................................5

Statement of the Case ..................................................................................6

    A.     Procedural History ...............................................................6

    B.     Overview of Lender-Placed Insurance ...............................6

    C.     BIC and MIC Provided LPI Coverage to GMACM Properties ............7

    D.     Plaintiffs Failed to Maintain Adequate Property Insurance .................9

    E.     State Regulation of Lender-Placed Insurance .....................................11

          1.     Texas ........................................................................13

          2.     New York ..................................................................14

          3.     New Hampshire ........................................................16

    F.     Plaintiffs' Claims ...............................................................16

    G.     The September 30 Order ....................................................19

    H.     Certification of Issue For Interlocutory Appeal .................................22

Summary of the Argument ........................................................................23

ARGUMENT ..............................................................................................26

Standard of Review ...................................................................................26

POINT I     THE FILED-RATE DOCTRINE BARS PLAINTIFFS'
                CLAIMS ALLEGING THAT THEY PAID "INFLATED" LPI
                PREMIUM CHARGES ..............................................................27

A.    The Filed-Rate Doctrine Precludes Collateral Judicial Challenges to the Reasonableness of Filed Rates .................... 27

B.    Plaintiffs' Claims Violate the Twin Principles of the Filed-Rate Doctrine ................................................................ 33

    1.    Plaintiffs Ask the Court to Second-Guess State Regulatory Agencies by Determining Whether the LPI Rates Were "Inflated" .............................................. 35

    2.    Plaintiffs Seek a Rebate for Allegedly "Inflated" LPI Charges, Violating the Nondiscrimination Principle ......................................................................... 38

POINT II    THE COURT SHOULD REJECT PLAINTIFFS' ATTEMPTS TO AVOID THE FILED-RATE DOCTRINE ................................. 39

A.    There Is No Indirect-Purchaser Exception to the Filed-Rate Doctrine ....................................................................... 40

B.    Plaintiffs' Attempt to Disguise Their Challenge to the Reasonableness of Filed Rates Fails ............................................ 48

POINT III    ANY ISSUES ABOUT LENDER-PLACED INSURANCE SHOULD BE ADDRESSED TO STATE INSURANCE REGULATORS ........................................................................ 53

A.    State Regulators Are Better Positioned Than Federal Courts to Address LPI Rates .................................................... 53

B.    State Agencies Have Actively Engaged in Oversight of LPI Rates ................................................................................ 56

CONCLUSION ....................................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*,
  524 U.S. 214 (1998) ...................................................................................32

*Ark. La. Gas Co. v. Hall*,
  453 U.S. 571 (1981) ..................................................... 28, 32, 37, 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................26

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003) ..................................................................35

*Carlin v. DairyAmerica, Inc.*,
  705 F.3d 856 (9th Cir. 2012) .................................................................31

*Curtis v. Cenlar FSB*, No. 13-Civ. 3007 (DLC),
  2013 WL 5995582 (S.D.N.Y. Nov. 12, 2013) ................................. 23, 28, 33, 36

*DeCambaliza v. QBE Holdings, Inc.*,
  No. 13-cv-286, 2013 WL 5777294 (W.D. Wis. Oct. 25, 2013).................... 36, 48

*Dolan v. Fidelity Nat'l Title Ins. Co.*,
  365 F. App'x 271 (2d Cir. 2010).........................................................28

*Fink v. Time Warner Cable*,
  714 F.3d 739 (2d Cir. 2013) ..................................................................26

*FTC v. Verity Int'l, Ltd.*,
  443 F.3d 48 (2d Cir. 2006) ..................................................................27

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  954 F.2d 485 (8th Cir. 1992)............................................................ 31, 43

*Hill v. BellSouth Telecomms., Inc.*,
  364 F.3d 1308 (11th Cir. 2004).........................................................31

*Hooks v. Am. Medical Sec. Life Ins. Co.*,
  No. 06-cv-71, 2008 WL 3911130 (W.D.N.C. Aug. 19, 2008) ...........................44

*Humana, Inc. v. Forsyth*,
   525 U.S. 299 (1999) ...........................................................................55

*Keogh v. Chicago Nw. Ry. Co.*,
   260 U.S. 156 (1922) ..................................................................... passim

*Kunzelmann v. Wells Fargo Bank, N.A.*,
   No. 11-cv-81373, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ...........................11

*LaBarre v. Credit Acceptance Corp.*,
   175 F.3d 640 (8th Cir. 1999) ...............................................................55

*Lander v. Hartford Life & Annuity Ins. Co.*,
   251 F.3d 101 (2d Cir. 2001) ................................................................54

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*,
   497 U.S. 116 (1990) ........................................................................27

*Marcus v. AT&T Corp.*,
   138 F.3d 46 (2d Cir. 1998) .............................................................. passim

*Miller v. Wells Fargo Bank, N.A.*,
   994 F. Supp. 2d 542 (S.D.N.Y. 2014) ..................................................... passim

*Montana-Dakota Util. Co. v. Nw. Public Serv. Co.*,
   341 U.S. 246 (1951) ........................................................................37

*Morales v. Attorneys' Title Ins. Fund., Inc.*,
   983 F. Supp. 1418 (S.D. Fla. 1997).........................................................27

*Riverview Health Inst. LLC v. Med. Mut. of Ohio*,
   601 F.3d 505 (6th Cir. 2010) ...............................................................55

*Roberts v. Wells Fargo Bank, N.A.*,
   No. 12-cv-200, 2013 WL 1233268 (S.D. Ga. Mar. 27, 2013) ..................... 36, 48

*Roussin v. AARP, Inc.*,
   664 F. Supp. 2d 412 (S.D.N.Y. 2009).......................................................43

*Royal Mile Co., Inc. v. UPMC*,
   No. 10-1609, 2013 WL 5436925 (W.D. Pa. Sept. 27, 2013)...............................43

*Schermer v. State Farm Fire & Cas. Co.*,
    721 N.W.2d 307 (Minn. 2006) ...............................................................54

*Simpkins v. Wells Fargo Bank, N.A.*,
    No. 12 Civ. 0768, 2013 WL 4510166 (S.D. Ill. Aug. 26, 2013) .........................21

*Square D Co.v. Niagara Frontier Tariff Bureau, Inc.*,
    476 U.S. 409 (1986) .................................................................... 30, 32

*Sun City Taxpayers' Ass'nv. Citizens Utils. Co.*,
    847 F. Supp. 281 (D. Conn. 1994) ........................................................ 35, 37

*Sun City Taxpayers' Assoc. v. Citizens Utils. Co.*,
    45 F.3d 58 (2d Cir. 1995) ...................................................................29

*Taffet v. S. Co.*,
    967 F.2d 1483 (11th Cir. 1992) (en banc) .............................................. 33, 35

*Turkmen v. Ashcroft*,
    589 F.3d 542 (2d Cir. 2009) ................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) .....................................................................38

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994) .......................................................... passim

## Statutes

12 U.S.C. §§ 2601 *et seq.* ............................................................... 5, 19

15 U.S.C. §§ 1011 *et seq.* .............................................................. 54, 55

18 U.S.C. §§ 1961 *et seq.* ............................................................. passim

28 U.S.C. § 1292 ..........................................................................5, 6

28 U.S.C. § 1331 ..........................................................................5

28 U.S.C. § 2072 ..........................................................................38

N.H. Code Admin. R. Ann. Ins. 2801.01 ...................................................16

N.H. Rev. Stat. Ann. § 412:15 ...................................................................12

N.H. Rev. Stat. Ann. § 412:16 .............................................................. 12, 16

N.Y. Ins. Law Ann. § 2303 ........................................................................14

N.Y. Ins. Law Ann. § 2304 ........................................................................14

N.Y. Ins. Law Ann. § 2314 ........................................................................12

Tex. Ins. Code Ann. § 2251.051 ...............................................................11

Tex. Ins. Code Ann. § 2251.052 ...............................................................13

Tex. Ins. Code Ann. § 2251.101 ...............................................................13

Tex. Ins. Code Ann. § 2251.103 ...............................................................13

Tex. Ins. Code Ann. § 2251.152 ...............................................................12

## Rules

Fed. R. Civ. P. 12 ............................................................................... 26, 27

## Regulations

12 C.F.R. § 1024.37 ..................................................................................45

N.Y. Comp. Codes R. & Regs. tit. 11 § 227 (Insurance Regulation 202)
    *available at* http://www.dfs.ny.gov/insurance/r_prop/rp202t.pdf ............... 15, 56

N.Y. Comp. Codes R. & Regs. tit. 11§ 160.0........................................12

28 Tex. Admin. Code § 5.9332.............................................................13

## Other Authorities

California Department of Insurance, *Press Release: California Department of
    Insurance announces $20.6 million rate reduction for homeowners* (Jan. 31,

2013), *available at* http://www.insurance.ca.gov/0400-news/0100-press-releases/2013/release010-13.cfm ....................................................................57

Center for Insurance Policy and Research, *Newsletter: Lender-Placed Insurance* (Oct. 2012), *available at* http://www.naic.org/cipr_newsletter_archive/vol5_lender_placed_insurance.pdf ................................................................................................................14

Florida Department of Insurance Press Release: *Office Approves Praetorian Insurance Company's Second Rate Filing for Lender-Placed Insurance* (Feb. 11, 2013), *available at* http://www.floir.com/PressReleases/viewmediarelease.aspx?id=2000 ..............57

Kenneth J. Meier, *The Politics of Insurance Regulation*, 58 J. of Risk & Ins. 700 (1991) .........................................................................11

Tex. Dep't of Ins., *Consumer Alert: Forced Placed Coverage*, *available at* http://www.tdi.texas.gov/consumer/documents/forceplaced.pdf. .......................14

## **Preliminary Statement**

Defendants-Appellants Balboa Insurance Company ("BIC"), Meritplan Insurance Company ("MIC"), and Newport Management Corporation ("NMC"; and together with BIC and MIC, "Defendants"), appeal from an interlocutory order of the United States District Court for the Southern District of New York (Alison J. Nathan, J.), entered on September 30, 2013 (the "September 30 Order"), which denied in relevant part their motion to dismiss the claims of Plaintiffs-Appellants Landon Rothstein ("Rothstein"), Jennifer and Robert Davidson (the "Davidsons"), and Ihor Kobryn ("Kobryn"; and together with Rothstein and the Davidsons, "Plaintiffs").  (SPA-1).  The district court certified the September 30 Order for appeal in a subsequent order (SPA-35), and this Court granted Defendants permission to appeal the September 30 Order.  (A-928).[*]

In this case, a putative nationwide class of mortgagors allege they were overcharged for lender-placed hazard insurance ("LPI")—even though the LPI rates they challenge were filed with and approved by state insurance commissions. Because the filed-rate doctrine precludes such a collateral attack on administratively approved rates, the Court should reverse the September 30 Order and dismiss Plaintiffs' claims.

---

[*] Citations to the Joint Appendix and to the Special Appendix appear herein respectively as "A-_" and "SPA-_," with the relevant page numbers inserted.

LPI is insurance coverage obtained by mortgage lenders or servicers to protect mortgaged properties when borrowers fail to maintain adequate homeowner's insurance (also known as hazard insurance), as standard mortgage agreements typically require. After a borrower is notified that he or she lacks adequate insurance but fails to take action, the lender may obtain insurance for the borrower's property, pay the premium in the first instance, and then pass on the cost to the borrower. Here, Plaintiffs are three borrowers who failed to maintain adequate homeowner's insurance. Pursuant to Plaintiffs' mortgage agreements, GMAC Mortgage, LLC. ("GMACM"), Plaintiffs' mortgage servicer, purchased LPI from MIC or BIC for their properties, and then directly passed on the cost of the premiums to Plaintiffs.

The basic theory of Plaintiffs' Complaint is that Defendants were part of a scheme to inflate the LPI premiums that Plaintiffs paid. Specifically, Plaintiffs allege that Defendants used money derived from "inflated" LPI premiums to pay "kickbacks" (in the form of free services) to GMACM in exchange for GMACM's business. Plaintiffs were overcharged for LPI, they claim, because although GMACM passed on the filed and approved LPI insurance premium *in toto,* GMACM did not subtract the value of the allegedly free services provided by Defendants.

2

The filed-rate doctrine bars Plaintiffs' claims as a matter of law.  Under that doctrine, "any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).  It is uncontested that BIC and MIC filed the allegedly "inflated" LPI rates with state insurance commissions.  In fact, Plaintiffs have conceded that if they had purchased insurance directly from Defendants at the same rates, the filed-rate doctrine would bar their claims.  Plaintiffs could hardly argue otherwise, because this Court has held that the doctrine bars any claims that depend on an allegation that filed rates were inflated.  *Id.* at 22.

Plaintiffs have nonetheless tried to distinguish their claims, *even though they are suing insurance rate-filers*, relying on the fact that, unlike direct purchasers of insurance, they were charged for LPI by an intermediary, GMACM.  As a result, they insist that their claims do not implicate the reasonableness of the filed LPI rates.  The district court, which recognized that there were no disputed questions of fact relevant to the filed-rate doctrine's application, accepted Plaintiffs' novel distinction and denied Defendants' motion to dismiss in relevant part.

The district court erred as a matter of law because Plaintiffs rely on a distinction without a difference.  Regardless of whether a plaintiff purchases insurance directly or is charged the same premiums by an intermediary, a suit

3

seeking damages for paying an allegedly "inflated" rate runs counter to the twin principles underlying the filed-rate doctrine:  preventing judicial interference in rate-setting and ensuring uniform treatment of all rate-payers.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998).  Plaintiffs' allegations that they were overcharged for LPI will enmesh the Court in the rate-making process no less than if Plaintiffs had purchased insurance directly from Defendants.  To find for Plaintiffs, the Court would have to evaluate claims that the filed rate was inflated because improper costs were recouped, and would have to determine the hypothetical reasonable rate that "should have been charged" for LPI.  Moreover, just as with direct-purchaser suits, a damages award for Plaintiffs would result in impermissible discrimination among rate-payers by leaving non-suing borrowers to pay the full LPI premiums while Plaintiffs would receive a rebate.

The federal courts are not the appropriate forum to remedy a claim that LPI rates are inflated.  State insurance commissions evaluate and have authority over such rates.  The district court's decision carving out an exception to the filed-rate doctrine for indirect insurance purchasers is wrong as a matter of law.  The Court therefore should reverse that decision and dismiss Plaintiffs' claims against Defendants.

**Jurisdictional Statement**

In the district court, Plaintiffs asserted claims against Defendants under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA").  The district court had jurisdiction to consider those claims under 28 U.S.C. § 1331.  In addition, because Plaintiffs brought this case as a putative class action, jurisdiction also existed under 28 U.S.C. § 1331(d)(2).

In the September 30 Order, the district court denied in relevant part Defendants' motion to dismiss Plaintiffs' claims.  (SPA-1).  Defendants moved to certify that interlocutory decision for appeal pursuant to 28 U.S.C. § 1292(b), and by order entered April 3, 2014, the district court granted that motion and certified the September 30 Order for appeal.  (SPA-35).  By Order entered June 25, 2014, this Court granted Defendants' petition for permission to appeal.  (A-928).

**Issue Presented for Review**

Whether the filed-rate doctrine bars claims challenging LPI premium charges that GMACM, Plaintiffs' mortgage servicer, paid in the first instance and then directly passed on to Plaintiffs, where BIC or MIC calculated the LPI premiums based on rates filed with, and approved by, state regulatory agencies.

## **Statement of the Case**

### A.    **Procedural History**

Plaintiffs initiated this lawsuit in April 2012, by filing a complaint asserting claims against Defendants and GMACM on behalf of a putative class of residential mortgage loan borrowers who were charged for LPI on loans serviced by GMACM.  (A-28).  Defendants moved to dismiss the claims asserted against them in Plaintiffs' Second Amended Complaint ("SAC").  (A-279).  On September 30, 2013, the district court granted in part and denied in part Defendants' motion.  (SPA-1).  The district court ruled in relevant part that the filed-rate doctrine did not bar Plaintiffs' claims.  (SPA-6-15).  Defendants moved to certify this ruling for appeal pursuant to 28 U.S.C. § 1292(b).  (A-781).  By order entered April 3, 2014, the district court granted Defendants' motion.  (SPA-35).  On June 25, 2014, this Court granted Defendants' petition for permission to appeal the September 30 Order.  (A-928).

### B.    **Overview of Lender-Placed Insurance**

Many people require financing to buy a home.  When a borrower enters into a home mortgage, the borrowers' interest in the property serves as collateral for the lender and secures the loan.  As a result, lenders—or investors in securities backed by the loan—have a significant stake in the mortgaged property.  To protect that interest, nearly every mortgage agreement or deed of trust includes a provision

requiring the borrower to maintain adequate homeowner's insurance to protect both the borrower's interest in his or her home and the lender's interest in securing the collateral underlying its mortgage loan.  (A-181, 182).

While most borrowers comply with their mortgage agreement's insurance requirements, if a borrower allows his or her coverage to lapse, lenders are exposed to significant risks.  Lenders—acting generally through third-party mortgage servicers that service the loans—typically take multiple steps to mitigate those risks.  If insurance coverage lapses, the mortgage servicers contact the borrower to apprise the borrower of the lapse and provide an opportunity to obtain adequate coverage.  (A-643-45).  After appropriate notice, the servicer may exercise the lender's right to obtain coverage in the borrower's stead and, after paying the premium in the first instance, bill the borrower for the cost of the insurance.  (A-171, 181).  Insurance coverage obtained in this fashion is commonly referred to as lender-placed insurance or "LPI."  (A-171).  LPI usually provides dwelling coverage only and does not provide liability or contents coverage for the borrower.  (A-181, 653-55, 664-66, 674-76).

## C.    BIC and MIC Provided LPI Coverage to GMACM Properties

Defendants BIC and MIC are insurance companies that offer LPI coverage throughout the United States.  (SPA-9).  In 2003, GMACM, a lender and mortgage servicer, entered into an agreement to purchase LPI from BIC and MIC.  (A-172,

187).  Pursuant to that agreement, BIC and MIC issued master insurance policies to GMACM to cover the entire portfolio of loans serviced by GMACM.  (A-187-88). If a specific borrower did not maintain a voluntary homeowner's insurance policy, then BIC or MIC would issue, pursuant to the master policy, insurance coverage for the borrower's property.  BIC or MIC would charge GMACM for the annual premium for this policy in the first instance.  (A-172).  GMACM would then pay the premium, and pass that entire charge on to the borrower whose property was being insured.[*]  (A-172).

To determine whether properties within their servicing portfolios have continuous insurance coverage, mortgage servicers like GMACM often enter into arrangements with vendors to monitor, or "track," the portfolios.  Such vendors determine whether borrowers have the required property insurance coverage, notify borrowers in the event of an insurance lapse or coverage deficiency, and secure LPI if needed.  (A-187, 189, 201).  Beginning in 2003, GMACM entered into an agreement with NMC—an affiliate of BIC and MIC—to have NMC provide tracking services for GMACM's loan portfolio.  (A-187).  As part of this arrangement, if NMC identified properties in GMACM's loan portfolio without insurance, it would send the borrowers a series of notice letters on GMACM's

---

[*] The LPI policy protects the underlying collateral for the mortgage and not the borrower's possessions.  The borrower is not a named insured, but has a right to make claims for damage to the property.  (A-655-56).

behalf, reminding the borrowers of their contractual responsibility to maintain adequate insurance and explaining that GMACM would obtain insurance for the property and charge the borrower for its cost if they did not provide proof of homeowner's insurance.  (A-210).

## D.     Plaintiffs Failed to Maintain Adequate Property Insurance

In the SAC, Plaintiffs Landon Rothstein, Jennifer and Robert Davidson, and Ihor Kobryn allege that they have mortgage loans secured by properties located in Texas, New Hampshire, and New York respectively, and that GMACM services these loans.  (A-176).  Each of Plaintiffs' mortgage agreements required them to maintain adequate hazard insurance on their properties.  (A-182).  If they failed to do so, their mortgages allowed the lender or servicer to "obtain insurance coverage at Lender's option and Borrower's expense," and provided that any amounts paid by the lender or servicer for that insurance would be charged to the borrower.[*]  (A-182).

Notwithstanding this requirement, for various periods between 2009 and 2012, each plaintiff failed to provide proof of adequate property insurance.  (A-176).  As a result, after providing Plaintiffs with multiple warning letters over a period of several months, GMACM procured the LPI from BIC or MIC.  (SPA-9).

---

[*] The SAC only refers to the language in Rothstein's mortgage, but alleges that the other mortgage agreements "contain substantively identical terms with respect to LPI."  (A-182) .

GMACM paid the LPI premiums to BIC and MIC in the first instance, and then added the LPI premium amount to the amounts owed by Plaintiffs.  (SPA-9).

For example, beginning in October 2010, Rothstein received a series of letters sent by NMC on GMACM's behalf informing him that GMACM had no record of current insurance coverage for his property and that he needed to provide proof of coverage to prevent GMACM from obtaining LPI.  (A-643-51).  The notices further informed Rothstein that he would be responsible for the cost of any such LPI policy.  (A-647, 650).  After Rothstein failed to provide proof of insurance, NMC notified him in January 2011 that GMACM had obtained LPI for the property from MIC.  (A-653).  GMACM paid MIC for the LPI premium and then passed that amount on to Rothstein.  (A-653).

Plaintiffs do not dispute that GMACM was entitled to purchase LPI for their properties, nor do they challenge the particular coverage that GMACM obtained. In addition, BIC or MIC cancelled each Plaintiffs' respective LPI policies mid-term and refunded any unearned premiums to GMACM.  (A-176).  Accordingly, Plaintiffs allege that GMACM ultimately charged Rothstein $105, the Davidsons $239, and Kobryn $1,260.70 for LPI coverage.[*]  (A-176).

---

[*] Because mortgage servicers like GMACM typically require insurers underwriting LPI to cover *any* property in the servicer's portfolio sight unseen – regardless of common underwriting factors like property condition and history of damage– insurers cannot tailor their pricing to risk to the same extent as in the individual market.  *See, e.g.*, *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373, 2013

**E.    State Regulation of Lender-Placed Insurance**

LPI rates are highly regulated.  In all three of the states in which Plaintiffs'

properties are located, i.e., Texas, New York and New Hampshire, regulatory

agencies have exclusive statutory responsibility to review and approve proposed

LPI rates.  Regulators in these states are charged with balancing a complex set of

open-ended factors in evaluating proposed rates.  Regulators play a consumer

protection role by assuring that rates are not too high, but also not too low, because

"insurance is an industry that collects payments today to cover potential losses at

some future time period," and "the insurer must remain solvent for an insurance

contract to have any value."  Kenneth J. Meier, *The Politics of Insurance*

*Regulation*, 58 J. of Risk & Ins. 700, 701 (1991); *see also* Tex. Ins. Code Ann.

§ 2251.051(c)(1) and (c)(2)(A) (explaining that a rate is "inadequate" if, *inter alia*,

it "is insufficient to sustain projected losses and expenses to which the rate applies"

and continued use of the rate would "endanger[] the solvency of an insurer using

---

WL 139913, at *1 (S.D. Fla. Jan. 10, 2013) (noting that LPI coverage was
provided "despite the absence of any underwriting").  As a result, LPI rates are
often higher than the rates borrowers can obtain for their own insurance, a fact that
mortgage servicers generally disclose to borrowers.  Here, the notification letters
issued to Plaintiffs cautioned them that LPI coverage "may be more expensive and
generally will provide less insurance protection than a policy you may be able to
secure from your own insurance company or agent."  (A-650-51, 661-62, 671-72);
*see also* (A-647, 659, 668) (letters warning Plaintiffs that LPI "may cost
substantially more than insurance you are able to obtain on your own").

the rate"); N.Y. Comp. Codes R. & Regs. tit. 11§ 160.0(c)(1) (similar); N.H. Rev. Stat. Ann. § 412:15(I)(c) (similar).

Either BIC or MIC has a filed hazard LPI program in every state in the country, including in Plaintiffs' states of Texas, New York, and New Hampshire. (A-178-79, 283-642).  Pursuant to the regulatory schemes in Plaintiffs' states, BIC or MIC provided the necessary information—including detailed information about their expenses, risk pools, historical and projected claims, and profit margins—to the applicable state regulators in accordance with state law.  Those regulators approved the rates submitted by BIC or MIC.  (A-283-642).  BIC or MIC then calculated the premiums for any LPI policies they issued in those states from these filed and approved rates.[*]  (SPA-5).

In Texas, New York and New Hampshire, the filed rates are deemed per se reasonable and insurers are legally barred from charging any other rate for insurance.  *See* Tex. Ins. Code Ann. § 2251.152; N.Y. Ins. Law Ann. § 2314; N.H. Rev. Stat. Ann. § 412:16(XII).  Here, it is undisputed that either BIC or MIC calculated the premiums applicable to each of Plaintiffs' properties from the rates that were filed and approved in each of Plaintiffs' respective states, and that each

_____

[*] BIC's and MIC's rate filings included a base rate and a methodology for calculating the applicable premium for an individual property using the base rate and an approved set of factors, such as the property's age or whether it is located in a tornado or hurricane territory.  *See, e.g.*, (A-367-368) (explaining rate calculation methodology in Texas).

12

Plaintiff was charged this same premium by GMACM.  (SPA-9).  The details of each state's regulatory scheme are described below.

### 1.    Texas

MIC is an admitted insurance carrier in Texas, where Rothstein's property is located.  (A 283-368).  The Texas Department of Insurance ("TDI") determines whether property insurance rates are "excessive, inadequate, unreasonable, or unfairly discriminatory for the risks to which the rate applies."  *See* Tex. Ins. Code Ann. § 2251.052(b).  The Texas Insurance Code requires insurers to file "all rates, applicable rating manuals, supplementary rating information, and additional information required" with the insurance commissioner, who shall disapprove the rate if he/she "determines that the rate does not comply with the [statutory requirements]."  *Id.* §§ 2251.101 (a), 2251.103(a).  Regulations further provide that insurers must offer supporting information to justify their rates, including "[a]ctuarial support" based on incurred and projected losses, "[p]rojected and historical expense information," and the methodology used to determine profit margin.  28 Tex. Admin. Code § 5.9332(2).  Pursuant to this scheme, MIC submitted its hazard LPI rates, rating schedules, and associated forms to the TDI, which reviewed and approved the rates.  (A-283-368).

The TDI has been actively engaged in the regulation and oversight of LPI and is well aware that the rates it approves are passed on to consumers.  In 2012,

the TDI held public hearings regarding LPI.  *See* Center for Insurance Policy and Research, *Newsletter: Lender-Placed Insurance* (Oct. 2012), *available at* http://www.naic.org/cipr_newsletter_archive/vol5_lender_placed_insurance.pdf. The TDI also has issued an alert to consumers describing LPI, noting its potential expense, and offering homeowners help securing refunds if LPI is improperly obtained.  *See* Tex. Dep't of Ins., *Consumer Alert: Forced Placed Coverage*, *available at* http://www.tdi.texas.gov/consumer/documents/forceplaced.pdf.

### 2.    New York

MIC is an admitted insurance carrier in New York, where Kobryn's property is located.  (A-369-593).  New York's insurance regulator, the New York Department of Financial Services ("NYDFS"; formerly the New York Department of Insurance ("NYDOI")), reviews property insurance rates to ensure that they are not "excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers."  N.Y. Ins. Law Ann. § 2303.  To discharge that responsibility, the agency is directed to consider, among other things, the insurer's "past and prospective loss experience," "all factors reasonably attributable to the class of risks," "a reasonable profit," and "past and prospective expenses."  *Id.* § 2304(a).  Insurers must submit proposed rates to the NYDFS along with their supporting information.  *Id.* § 2305(c).  Following those instructions, MIC submitted its lender-placed insurance rates, rating schedules, and

associated forms to the then NYDOI, which reviewed and approved the rates.  (A-283, 369-593).

As Plaintiffs' SAC reflects, New York regulatory agencies have paid substantial attention to LPI rates and understand that borrowers generally pay them.  In 2012, NYDFS conducted an investigation and held hearings regarding the LPI industry and LPI rates.  (A-202-06).  Following the investigation, the agency entered consent decrees with numerous industry participants, including BIC and MIC, that provided a mechanism for borrowers to obtain partial refunds directly from insurers.[*]  (A-784).  NYDFS also has proposed regulations for LPI that would, among other things, adjust requirements for rate filing information, impose a maximum loss ratio, restrict commissions, and establish conditions under which insurers or their affiliates may provide mortgage tracking services.  *See* NYDFS, Proposed N.Y. Comp. Codes R. & Regs. tit. 11 § 227 (Insurance Regulation 202), *available at* http://www.dfs.ny.gov/insurance/r_prop/rp202t.pdf.  The regulations would not prohibit insurers or their affiliates from providing tracking services and charging less than the full costs, because they recognize that such services may benefit the insurers themselves by allowing them "to identify and protect the insurer from exposure to lost premium and losses on properties on which no other insurance coverage is in effect."  *Id.* § 227(g)(2).

---

[*] This consent decree contained no findings or conclusions of fraudulent or unlawful conduct by Defendants.  (A-784).

### 3. New Hampshire

BIC is an admitted carrier in New Hampshire, where the Davidsons' property is located. (A-594-642). Insurers must file with the New Hampshire Insurance Commissioner "every manual, minimum premium, class rate, rating schedule or rating plan and every other rating rule, and every modification of any of the foregoing which it proposes to use." N.H. Rev. Stat. Ann. § 412:16(II). The Commissioner, in turn, must determine that the rates are not "excessive, inadequate, or unfairly discriminatory." *Id*. § 412:15(I). To review proposed rates, the Department considers information provided by the filer concerning, among other things, its prospective losses and expenses. N.H. Code Admin. R. Ann. Ins. 2801.01. Following these requirements, BIC submitted its rates and associated forms to the New Hampshire insurance commissioner, who approved the rates for use in the state. (A-283, 594-642).

### F. Plaintiffs' Claims

Plaintiffs filed this case on behalf of a putative nationwide class of residential mortgage loan borrowers who had loans serviced by GMACM, and who GMACM had charged for LPI.[*] Plaintiffs initially filed suit against GMACM and

---

[*] The original complaint named Rothstein as the sole plaintiff. (A-28). Davidson and Kobryn were added in the First Amended Complaint. (A-79). Plaintiffs subsequently filed their SAC (A-168), and the September 30 Order denying Defendants' motion to dismiss the SAC is the subject of this appeal.

its affiliates, as well as against Defendants.  (A-28).  Plaintiffs have since

voluntarily dismissed their claims against GMACM and its affiliates, and now

press their claims exclusively against Defendants.[*]

Although Plaintiffs' legal theories have changed with successive

amendments to their complaint, their basic contention is that they were

overcharged for LPI because the insurance premiums that GMACM passed on to

them were purportedly "inflated" by improper kickbacks and rebates that GMACM

should have subtracted from the premium amounts.  (A-172-73).  Specifically, the

SAC alleges that GMACM, along with Defendants, devised a "kickback scheme"

at the inception of their relationship in 2003 that required BIC and MIC to pay

"secret rebates" to GMACM while borrowers are billed the "full purported price of

the LPI."  (A-188).

---

[*] In the original complaint, Plaintiffs asserted numerous claims against GMACM under both federal law and various state-law theories, including RICO, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  (A-28).  After GMACM's corporate parent, Residential Capital LLC, filed for bankruptcy, Plaintiffs amended their complaint to substitute Ally Financial, Inc. and Ally Bank as Defendants for GMACM, under alter ego and agency theories.  (A-79-80).  On March 16, 2014, Ally Financial and Ally Bank were voluntarily dismissed with prejudice.  (A-862).  Plaintiffs also have filed a proof of claim in the Residential Capital LLC bankruptcy, seeking one billion dollars based on GMACM's allegedly unlawful actions.  *See* Proof of Claim No. 4074, *In re Residential Capital LLC*, No. 12-12032 (Bankr. S.D.N.Y. filed Nov. 9, 2012), *available at* https://www.kccllc.net/rescap/document/1212032121109000000000025.

The nature of these alleged "secret rebates" has shifted over the course of the litigation. Plaintiffs first alleged that BIC and MIC paid "bogus 'commissions'" to an affiliate of GMACM, "John Doe," with money supposedly "derived from the LPI premiums paid by GMACM," and that "John Doe" transferred these commissions to GMACM, thereby reducing the cost of the insurance to GMACM. (A-191-92). But after initial discovery in the district court, Plaintiffs withdrew their allegations concerning these alleged "commissions," having apparently realized that no such commissions were paid.[*] *See* Pls. Answer in Opp'n to Defs. Pet. for Permission to File Appeal ("Pls. Answer"), No. 14-1112 (2d Cir. filed Apr. 24, 2014), ECF No. 16, at 3 n.4

Instead, Plaintiffs now rely on a second "kickback" theory. Plaintiffs allege that NMC provided "free tracking services" to GMACM, and that BIC and MIC, rather than GMACM, paid NMC for these services. (A-188). According to Plaintiffs, these payments to NMC are "derived from the gross premiums that GMACM pays to [BIC] and [MIC] for the LPI," which BIC and MIC route to NMC via "intercompany expense allocations." (A-188). Plaintiffs assert that the free tracking services "constitute rebates/kickbacks in kind" (A-189), and that GMACM continued to purchase hazard insurance from BIC/MIC as a "*quid pro*

---

[*] On May 20, 2014, Plaintiffs filed a Third Amended Complaint. (A-869). This latest complaint omits Plaintiffs' allegations about kickbacks paid through "bogus commissions." (A-869). No other changes are material to the question presented in this appeal.

*quo*" for these rebates/kickbacks. (A-257). According to Plaintiffs, because GMACM did not reduce the premiums it charged Plaintiffs by the value of the alleged free tracking services, Plaintiffs have been forced to pay "inflated" LPI charges. (A-174, 189, 255-57, 264, 267).

Based on these allegations, Plaintiffs' SAC asserts that Defendants have violated, and conspired to violate, RICO by engaging in a pattern of racketeering activity as part of an "enterprise" that was "primarily managed by GMACM." (A-255-68). Plaintiffs claim they were injured by these violations because they "*paid falsely inflated, unauthorized LPI charges* by reason . . . of the scheme alleged." (A-264, 267) (emphasis added). Plaintiffs seek, *inter alia*, damages constituting "three times the amount of the excess charges imposed." [*] (A-277).

## G.    The September 30 Order

Defendants moved to dismiss all claims asserted against them, arguing in relevant part that the filed-rate doctrine required dismissal of Plaintiffs' claims. (A-279). Defendants contended that continued litigation of Plaintiffs' claims would: (1) impermissibly require the court to review the propriety of Plaintiffs' LPI premiums that were previously filed with and approved by applicable state

---

[*] The SAC also asserted a claim against Defendants under RESPA. The district court dismissed this claim in the September 30 Order, and that decision is not at issue in this appeal. (SPA-33).

19

regulators; and (2) lead to price discrimination if Plaintiffs prevailed and ended up paying less for LPI than non-suing borrowers.  (SPA-8).

In the September 30 Order, the district court denied Defendants' motion in relevant part.  (SPA-1).  In particular, the district court concluded that the filed-rate doctrine did not require dismissal of Plaintiffs' claims against Defendants.  (SPA-6-14).

Reviewing the facts alleged in the SAC, the district court first noted that Plaintiffs had each signed a mortgage agreement that required them to maintain adequate hazard insurance on their properties and, if they failed to do so, permitted their lender to "obtain insurance coverage at Lender's option and Borrower's Expense."  (SPA-9).  The district court further observed that each Plaintiff had received a series of notification letters before GMACM exercised its rights under their respective mortgage agreements and purchased LPI from either BIC or MIC, and that GMACM paid for the insurance in the first instance and then added that amount to the amount each Plaintiff owed.  (SPA-9).

The district court recognized that there was "no dispute that the relevant rate charged by BIC/MIC for the [LPI] was filed and approved" with the applicable state regulatory agencies.  (SPA-9).  The court also acknowledged that it was undisputed  "that had Plaintiff purchased hazard insurance from BIC/BIC *at these same rates*" then the "filed-rate doctrine would bar them from challenging those

rates." (SPA-9) (emphasis added). According to the district court, the dispositive question was "whether GMACM's purchase and forced-imposition of the rates that BIC/MIC filed and had approved is functionally equivalent to Plaintiffs purchasing hazard insurance from BIC/MIC directly." (SPA-9-10).

In its analysis of this question, the district court reviewed cases from other district courts that had divided on the question of whether borrowers could bring challenges alleging that LPI premiums charges were inflated.[*] (SPA-10-12). The district court also reviewed this Court's decisions in *Wegoland Ltd.*, 27 F.3d at 18 and *Marcus*, 138 F.3d at 58-59, both of which held that the filed-rate doctrine barred damages claims premised on allegations that plaintiffs were injured by paying a filed, and allegedly inflated, rate. (SPA-12). According to the district court, there was a "critical factual distinction" between this case and cases like *Wegoland Ltd.* and *Marcus*: while those cases involved "a simple A-to-B transaction—in which A, the insurer, approved a rate and charged it to B," the

---

[*] The district court's discussion included citations to a number of cases from other district courts holding that the filed-rate doctrine did not bar factually similar claims. (SPA-10-12). Those cases were wrongly decided because none accounted for how the claims implicated the twin principles of the doctrine. *See, e.g.*, *Simpkins v. Wells Fargo Bank, N.A.*, No. 12 Civ. 0768, 2013 WL 4510166, at *14 (S.D. Ill. Aug. 26, 2013) (concluding that filed-rate doctrine did not bar claims that challenged "the manner in which defendants select the insurers, the manipulation of the force-place insurance policy process, and the impermissible kickbacks included in the premiums," but failing to consider how an award of damages would violate the nonjusticiability and nondiscrimination prongs of the filed-rate doctrine).

alleged LPI scenario presented here involved "A (BIC or MIC) receiv[ing] approval from the state regulators to charge a certain rate to insurers, after which B (GMACM) billed C (Plaintiffs) for the insurance it had purchased from A." (SPA-13). The district court reasoned that Defendants had not demonstrated that "amounts billed in this second scenario"—in which an intermediary passed on the filed rate—had been filed with and approved by a government agency. (SPA-13).

The district court also added that, "[i]f anything," the relevant rate-filing documents submitted by Defendants with their motion suggested that the filed LPI rates had not been reviewed by state agencies "for . . . direct application" to borrowers. (SPA-13-14). Accordingly, the district court held that the filed-rate doctrine did not bar Plaintiffs' claims, and denied Defendants' motion on this ground. (SPA-14).

## H.    Certification of Issue For Interlocutory Appeal

Defendants moved to certify for interlocutory appeal the portion of the district court's order denying their filed-rate defense. (A-781). The district court granted the motion. (SPA-35).

In doing so, the district court rejected Plaintiffs' contention that the issue presented by the appeal was "fact-intensive." (SPA-37). To the contrary, the district court reiterated that there was no dispute that the LPI premium rates charged by BIC and MIC were "filed and approved," such that the filed-rate

22

doctrine would bar a direct purchaser's challenge to the same rates.  (SPA-38).

The district court also explained that there was a "substantial ground for difference

of opinion" on the question presented in light of the conflict of district court

authority both within and outside the Second Circuit.  (SPA-38) (internal quotation

marks omitted).  In particular, the court noted that since its opinion denying

Defendants' motion to dismiss, two other courts within the Southern District of

New York had held that the filed-rate doctrine barred claims brought by a

homeowner against an LPI provider that were predicated on allegedly "inflated"

premium charges.  (SPA-38-39) (citing *Miller v. Wells Fargo Bank, N.A.*, 994 F.

Supp. 2d 542, 553-54 (S.D.N.Y. 2014), and *Curtis v. Cenlar FSB*, No. 13-Civ.

3007 (DLC), 2013 WL 5995582, at *3-4 (S.D.N.Y. Nov. 12, 2013)).

　　　This Court granted Defendants' petition for interlocutory appeal.  (A-928).

The district court subsequently stayed all proceedings pending the appeal.  (A-

930).  This appeal followed.

## Summary of the Argument

　　　The Court should reverse the September 30 Order and dismiss Plaintiffs'

claims.  Under the filed-rate doctrine, rates filed with a regulatory agency are "per

se reasonable" and cannot be attacked in judicial proceedings.  *Wegoland Ltd.*, 27

F.3d at 18.  As the Supreme Court has recognized, this doctrine bars any suit in

which plaintiffs allege that "[t]he instrument by which" they were injured was

23

paying the filed rate. *Keogh v. Chicago Northwestern Railway Co.*, 260 U.S. 156, 161 (1922). This Court has articulated "two 'companion' principles" that underline the doctrine: a nonjusticiability principle, which prohibits courts from second-guessing or interfering with exclusive regulatory authority over rate-setting, and a nondiscrimination principle, which prevents individual rate-payers from paying favorable rates by bringing lawsuits. *Marcus*, 138 F.3d at 58. If a claim implicates either of these principles, the filed-rate doctrine bars the claim. *See* Point I.A, *infra*.

Here, Plaintiffs' claims that they were injured by paying "inflated" rates for LPI violate both principles. Plaintiffs do not dispute that the rates charged by Defendants for LPI were filed with and approved by state regulatory agencies, nor do they deny that GMACM passed those rates on to them without modification. Plaintiffs' claims would inevitably enmesh the court in the rate-setting process by asking it to decide whether and to what extent BIC and MIC inflated their LPI rates—either through improper cost submissions or excessive profit margins—in order to offset the cost of tracking services provided by their affiliate NMC to GMACM. In this respect, Plaintiffs' claims are materially indistinguishable from the claims in *Wegoland Ltd.*, in which this Court held that the filed-rate doctrine barred allegations that a rate-filer inflated its rates by using an affiliate to disguise its overstated costs. 27 F.3d at 18. Plaintiffs' claims also run afoul of the

24

nondiscrimination principle, because Plaintiffs effectively seek an LPI premium rebate through litigation.  *See* Point I.B, *infra*.

The district court's reasoning that the filed-rate doctrine did not apply because Plaintiffs were charged the filed rate by an intermediary, i.e., GMACM, rather than by the rate filer itself, i.e., BIC or MIC, is unpersuasive.  Courts, including this one, have not hesitated to apply the filed-rate doctrine to bar claims brought by indirect purchasers like Plaintiffs when those claims implicate the reasonableness of the filed rate.  That is because the key issue for determining whether the doctrine applies is whether the plaintiffs' claims call the filed rate into question, not whether the plaintiffs are in privity with the rate filer.  Moreover, the district court's suggestion that state regulatory agencies do not approve LPI rates for application to borrowers is inconsistent with the actual statements and practices of those agencies, and finds no support in Defendants' rate filings.  *See* Point II.A, *infra.*

The Court likewise should reject Plaintiffs' recent arguments as to why their claims supposedly do not implicate the filed-rate doctrine.  According to Plaintiffs, the basis for their claim is that they were billed for LPI above GMACM's true costs.  But Plaintiffs' effort to evade the filed-rate doctrine is inconsistent with their own allegations and legal theory.  Plaintiffs' claims depend *fundamentally* on the premise that BIC and MIC's LPI rates were inflated, allowing Defendants to

use excessive premiums to pay for an alleged kick-back to GMACM. To evaluate that premise, the court inevitably would have to scrutinize the LPI rates, asking, for example, whether BIC and MIC relied on non-chargeable costs to justify their rate or claimed an inappropriately high profit margin. Such judicial second-guessing is precisely what the filed-rate doctrine forbids. *See* Point II.B, *infra*.

Plaintiffs' complaints about LPI rates should be directed to state agencies, which have actively regulated LPI and reviewed LPI rates paid by borrowers. Individual ratepayers like Plaintiffs simply have no role in attacking the reasonableness of LPI premium rates in federal court. *See* Point III, *infra*. Accordingly, the Court should reverse the September 30 Order and dismiss Plaintiffs' claims.

## **ARGUMENT**

### **Standard of Review**

This Court reviews the denial of a motion to dismiss a complaint *de novo*. *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009). For a complaint "'[t]o survive a motion to dismiss'" filed under Fed. R. Civ. P. 12(b)(6), it "'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint cannot state a

plausible basis for relief if the plaintiff's claims, fairly construed, are barred by the filed-rate doctrine as a matter of law. [*] *Simon*, 694 F.3d at 201.

## POINT I

### THE FILED-RATE DOCTRINE BARS PLAINTIFFS' CLAIMS ALLEGING THAT THEY PAID "INFLATED" LPI PREMIUM CHARGES

#### A.    The Filed-Rate Doctrine Precludes Collateral Judicial Challenges to the Reasonableness of Filed Rates

The filed-rate doctrine provides that a rate filed with and approved by a regulatory agency is "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd.*, 27 F.3d at 18.  The basic premise underlying this long established rule "is the desire to 'preserv[e] the exclusive role of . . . agencies in approving rates . . . by keeping courts out of the rate-making process." *Simon*, 694 F.3d at 207 (quoting *Marcus*, 138 F.3d at 58).

The filed-rate doctrine traces back to judicial interpretations of the Interstate Commerce Act.  *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990).  In one of the doctrine's earliest applications, the Supreme Court in *Keogh* upheld the dismissal of an antitrust suit alleging that a group of interstate

---

[*] In the district court, Defendants filed their motion under both Fed. R. Civ. P. 12(b)(6) and 12(b)(1), in light of case law indicating that application of the filed-rate doctrine deprives the plaintiff of standing.  *See, e.g.*, *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 61 (2d Cir. 2006) (analyzing whether the filed-rate doctrine "deprives the FTC of standing and requires dismissal of its complaint"); *Morales v. Attorneys' Title Ins. Fund., Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997). Regardless of whether the filed-rate doctrine is understood to prevent standing or instead to bar relief on the merits, it requires dismissal of Plaintiffs' claims.

carriers conspired to fix transportation rates at an unnaturally high level.  The Supreme Court assumed that the plaintiff might have paid lower rates but for the alleged conspiracy, but it nonetheless rejected the plaintiff's claim as inconsistent with the legislature's exclusive delegation of rate-setting authority to the Interstate Commerce Commission.  *Id.* at 161-62.  Under the law, once the Commission approved a schedule of rates as reasonable, carriers were prohibited from charging any other rate "[u]nless and until suspended or set aside."  *Id.* at 163.  Accordingly, the Court concluded that a private plaintiff could not pursue a claim seeking to recover damages where "the instrument by which [it] is alleged to have been damaged are rates approved by the Commission."  *Id.* at 161.  If the rule were otherwise, the Court reasoned, it would undermine the legislature's goal of ensuring uniform treatment of rate-payers.  *Id.* at 163.

Since *Keogh*, the filed-rate doctrine "has been extended across the spectrum of regulated utilities," *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981), as well as to the insurance industry, *see Dolan v. Fidelity Nat'l Title Ins. Co.*, 365 F. App'x 271 (2d Cir. 2010) (title insurance); *Curtis*, 2013 WL 5995582, at *3 (applying the doctrine to homeowner's insurance and recognizing that "District Courts in the Second Circuit consistently apply the Filed-Rate Doctrine in the insurance context").  It also has been applied to rates filed with state agencies, thus precluding federal claims that implicate the reasonableness of rates filed and

approved pursuant to state law. *See Wegoland Ltd.*, 27 F.3d at 20 ("[C]ourts have uniformly held, and we agree, that the rationales underlying the filed-rate doctrine apply equally strongly to regulation by state agencies.").

Through a century of application, the filed-rate doctrine has been distilled into "two 'companion' principles'": a nonjusticiability principle and a non-discrimination principle. *Marcus*, 138 F.3d at 58. Underlying both is *Keogh*'s admonition that a private plaintiff cannot bring a claim where "the instrument by which . . . damage is alleged to have been inflicted" is the paying of the filed rate." 260 U.S. at 165.

The nonjusticiability principle proceeds from the premise that courts should leave rate-setting to expert agencies. As this Court has summarized the case law, this principle recognizes that:

> (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues;
>
> (2) courts lack the competence to set . . . rates; and
>
> (3) the interference of courts in the rate-making process[,][which would arise if courts reexamined the rate-making factors or second-guessed what a rate "should" be,] would subvert the authority of rate-setting bodies and undermine the regulatory regime.

*Sun City Taxpayers' Assoc. v. Citizens Utils. Co*., 45 F.3d 58, 62 (2d Cir. 1995).

Applying the nonjusticiability principle, courts consistently dismiss claims that invite judicial second-guessing of rate-setting. This occurs, for example, when

the plaintiff's theory of injury would require the court to determine damages by measuring the difference between "an artificially high rate" that the plaintiff was required to pay and the "hypothetical reasonable rate" that the plaintiff contends should have been charged.  *Wegoland Ltd.*, 27 F.3d at 19.

For instance, in *Keogh* and *Square D Co.*, the Supreme Court held that the doctrine barred antitrust claims where the plaintiff sought as damages the difference between the rate it paid and a hypothetical lower rate that might have been filed and approved absent the alleged conspiracy.  *Square D Co.v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 413 (1986); *Keogh*, 260 U.S. at 161. Similarly, in *Wegoland Ltd.*, the plaintiffs claimed that their telephone company had inflated its filed and approved rates by fraudulently inflating the costs it had submitted as part of its rate filings.  27 F.3d at 21.  This Court held that plaintiffs could not pursue RICO and state-law claims based on this alleged conduct:  while the plaintiffs insisted that they only sought "damages for fraud," the Court explained that determining the amount of such damages would call for a judicial evaluation of the rate's reasonableness, because it would require the district court to calculate the difference between the approved rate and "the rate that would have been deemed reasonable absent the fraudulent acts."  *Id.* (emphasis omitted, internal quotation marks and citation omitted).  And in *Marcus*, this Court upheld the dismissal of claims alleging that AT&T concealed a billing practice that was

30

nevertheless evident in its tariff, where the class plaintiffs claimed damages based on the difference between AT&T's rate and the best alternative rate under a competitor's tariff.  138 F.3d at 60-61.  While the Court allowed that "awarding these damages would not amount to judicial rate-making *per se*," it explained that the doctrine "precludes any judicial action which undermines agency rate-making authority."  *Id.* at 61.  Other courts likewise have held that the filed-rate doctrine bars claims whose theory of damages implicates the reasonableness of the filed rate, even if the plaintiff's "claim does not directly attack the filed rate."  *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1315-17 (11th Cir. 2004); *see also Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 874 (9th Cir. 2012) ("[W]e have made it clear that the doctrine precludes remedies which rely on a court's recalculation of rates which would have been charged, even if the plaintiff is not directly challenging the filed rate."); *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir. 1992) (affirming dismissal under the filed-rate doctrine where the court was "convinced that the . . . class's RICO damages can only be measured by comparing the difference between the rates the Commission originally approved and the rates the Commission should have approved absent the conduct of which the class complains.").

The non-discrimination principle in turn recognizes that private lawsuits by rate-payers challenging rates "undermine the [legislative] scheme of uniform rate

regulation." *Ark. La. Gas Co.*, 453 U.S. at 579. A regulator could hardly ensure uniform treatment if rate-payers could opt-out of the filed rate by seeking a damages award that would effectively allow them to pay a lower rate that was "never filed with the [agency]." *Id*; *see also Wegoland Ltd.*, 27 F.3d at 19 (recognizing that judicial relief leads to rate discrimination because "a victorious plaintiff would end up paying less than similarly situated non-suing customers"). For that reason, if there is a duty to file a rate for regulatory approval, then the filed rate is considered per se reasonable and is the *only* rate that the regulated entity may legally charge. *See Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998). That is true with respect to all of the LPI premium rates filed here. *See supra* Stmt. of Case, § E.

If a damages claim implicates the filed-rate doctrine's "twin principles," then the doctrine applies. *Simon*, 694 F.3d at 205. And when it applies, the doctrine is "rigid and unforgiving," barring the plaintiffs' claims without regard to the "culpability of the defendant's [alleged] conduct or the possibility of inequitable results." *Id.* (citation omitted); *see also Wah Chang v. Duke Energy Trading & Mktg.*, 507 F.3d 1222 (9th Cir. 2007) (where the filed-rate doctrine applies, its "fortification against direct attack is impenetrable").

Of course, the filed-rate doctrine does not grant a rate-filer immunity for unlawful conduct or insulate filed rates from government scrutiny. *See Square D*

32

*Co.*, 476 U.S. at 422.  The reviewing agency can always re-evaluate rates to determine whether certain expenses were wrongfully included.  And "[w]hile individual ratepayers are precluded from challenging the reasonableness of the rates" in court, "the proper government officials remain free to pursue [claims] in appropriate circumstances."  *Wegoland Ltd.*, 27 F.3d at 22.  The filed-rate doctrine represents a well-settled judgment that, over the long run, allowing rate-filers to come into court alleging an injury from paying the filed rate would do consumers more harm than good.  *See Taffet v. S. Co.*, 967 F.2d 1483, 1491 (11th Cir. 1992) (en banc) ("Allowing consumers of the Utilities' services to recover damages for 'fraudulent' rates or otherwise 'erroneous' rates would disrupt greatly the states' regulatory schemes and, in the end, would cost consumers dearly.").

## B.    Plaintiffs' Claims Violate the Twin Principles of the Filed-Rate Doctrine

The filed-rate doctrine bars Plaintiffs' claims because they violate both of the doctrine's "twin principles."  *Simon*, 694 F.3d at 205; *see also Curtis*, 2013 WL 5995582, at *1, *3 (dismissing claims alleging that insurers "inflat[ed] the price of insurance" to pay kickbacks to a mortgage servicer because adjudicating such claims "would implicate both the rate-discrimination concern and the justiciability concern").  Accordingly, the Court should reverse the September 30 Order.

Plaintiffs allege that they paid "inflated" LPI premium costs because Plaintiffs' LPI insurers, BIC and MIC, conspired with Plaintiffs' mortgage

servicer, GMACM, to overcharge Plaintiffs for LPI by incorporating secret kickbacks into the rates. (A-72-74). Specifically, they contend that the insurers passed on kickbacks to GMACM by providing GMACM with free mortgage tracking services through their affiliate NMC with money "derived from the gross [LPI] premiums." (A-188-89).

Plaintiffs' overriding theory then is that the LPI premiums GMACM charged them were too high—or "inflated"—because those rates were used to offset free tracking services provided by the insurers' corporate affiliate NMC that were allegedly unrelated to the cost of homeowner's insurance. This theory directly challenges the validity of the rate schedules BIC and MIC filed with state insurance commissions. It claims the rates were inappropriate and were the product of inappropriate costs. Indeed, the claims at issue here are no different than the RICO and common-law fraud claims this Court dismissed in *Wegoland Ltd.* There, as here, plaintiffs alleged that the rate-filers entered into "a scheme" to use their corporate affiliates to disguise their true costs, all in order "to support the inflated rates" that customers were charged. 27 F.3d at 18. As in *Wegoland Ltd.*, and as further discussed below, allowing Plaintiffs' claims to go forward would conflict with the filed-rate doctrine's twin principles by (1) enmeshing the court in the rate-setting process, and (2) fostering discrimination among rate payers.

1.    **Plaintiffs Ask the Court to Second-Guess State Regulatory Agencies by Determining Whether the LPI Rates Were "Inflated"**

Plaintiffs' claims violate the nonjusticiability principle because they require the court to decide whether the LPI rates BIC and MIC filed were inflated by secret kickbacks to mortgage servicers like GMACM.  This consequence follows directly from Plaintiffs' theory of injury and their claim for damages.

For plaintiffs to have standing to assert civil RICO claims, they must plead that they suffered an injury to their business or property that was caused by the defendants' RICO violation.  *See Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003).  Here, Plaintiffs try to satisfy this requirement by alleging that they were induced to pay "falsely inflated, unauthorized LPI charges."  (A-264, 267). Plaintiffs' theory is incompatible with the filed-rate doctrine, because "a ratepayer cannot suffer an injury to his 'business or property' . . . if he pays the filed rate, even if that rate is obtained through fraud."  *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 847 F. Supp. 281, 290 (D. Conn. 1994) (Cabranes, J.) *aff'd*, 45 F.3d 58 (2d Cir. 1995); *see also Taffet*, 967 F.2d at 1495 (rejecting a RICO claim as barred by the filed-rate doctrine because "one does not suffer the predicate 'injury to business or property' by paying the filed rate") (citation omitted).

Plaintiffs' claim for damages itself directly contravenes the nonjusticiability principle.  Following from their defective theory of injury, Plaintiffs seek to

recover "excess" LPI premium charges as compensatory damages (subject to trebling).  (A-277).  To assess the magnitude of these "overcharge[s]," the court "would have to determine a 'hypothetical reasonable rate' in order to determine the difference from the rate actually paid."  *Wegoland Ltd.*, 27 F.3d at 19 (citation omitted).  Thus, to award Plaintiffs any damages, the court would have to decide how much of the filed LPI premium rate was fair and reasonable, and how much was attributable to alleged subsidized tracking services paid to GMACM and hidden in the filed rate in the form of either impermissible costs or excessive profits.  *See* (A-211, 256, 262-63) (alleging that Plaintiffs were required to pay the "full cost of the premiums" for LPI without "subtracting the rebates/kickbacks").  Such a calculation "would, in effect, result in a judicial determination of the reasonableness of the premium [Plaintiffs] paid."  *Roberts v. Wells Fargo Bank, N.A.*, No. 12-cv-200, 2013 WL 1233268, at *13 (S.D. Ga. Mar. 27, 2013) (concluding that the filed-rate doctrine applied to similar claims regarding "excess" charges for LPI premiums); *see also Curtis* 2013 WL 5995582, at *3 (holding that the filed-rate doctrine barred a challenge alleging that a borrower's LPI costs were "inflated" because resolving that question would force the court to determine what qualifies as a reasonable rate); *DeCambaliza v. QBE Holdings, Inc.*, No. 13-cv-286, 2013 WL 5777294, at *7 (W.D. Wis. Oct. 25, 2013) ("The alleged kickbacks in this case are part of a premium that was approved by a regulatory entity. . . . In

36

order to calculate the amount of the alleged kickbacks, it would be necessary for this court to determine a reasonable rate and subtract it from the premium.").

As the Supreme Court has instructed, it is not "open to the courts to determine what the reasonable rates during the past should have been." *Montana-Dakota Util. Co. v. Nw. Public Serv. Co.*, 341 U.S. 246, 251 (1951). Courts are not well equipped to decide whether state insurance commissions would or should have approved a lower rate due to alleged unreimbursed tracking-related costs insurers incurred on behalf of mortgage servicers. *See Sun City Taxpayers' Ass'n*, 45 F.3d at 62; *Wegoland Ltd.*, 27 F.3d at 21. As discussed above, *supra* Stmt. of Case, § E, insurance rate regulation is a complex undertaking that considers multiple factors—such as costs, insurer solvency, appropriate profit margins, and nondiscrimination principles—and it balances sometimes competing objectives. State insurance commissions are charged not only with protecting consumers against rates that are too high, but also with ensuring that rates are not *too low* because inadequate rates risk insolvency and could result in the nonpayment of future claims or taxpayers picking up the tab.

Because the filed-rate doctrine bars the judicial "award of a retroactive rate [decrease] based on speculation about what the [state insurance commissions] might have done," *Ark. La. Gas Co.*, 453 U.S. at 572, the Court should dismiss Plaintiffs' claims.

## 2.    Plaintiffs Seek a Rebate for Allegedly "Inflated" LPI Charges, Violating the Nondiscrimination Principle

Plaintiffs' claims also violate the filed-rate doctrine's nondiscrimination principle.  Plaintiffs are effectively asking for an LPI premium rebate; they claim that the filed rate overstated the true costs for LPI, and they want to pay lower premiums that strip out the kickbacks that GMACM allegedly received from BIC and MIC.  (A-173, 188, 191).  If Plaintiffs were successful in this claim, they would pay lower premiums for LPI obtained from BIC or MIC, while other borrowers who received LPI would pay the full sticker price.  The filed-rate doctrine is intended to prevent such disparate treatment.  *See Ark. La. Gas Co.*, 453 U.S. at 579; *Keogh*, 260 U.S. at 163-64; *Marcus*, 138 F.3d at 60-61.

Moreover, it is irrelevant that Plaintiffs' Complaint is styled as a class action.  This Court has recognized that "nondiscrimination concerns remain viable even in the context of a class action lawsuit." *Marcus*, 138 F.3d at 61.  And for good reason.  It would be highly anomalous, and likely in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b), if plaintiffs could defeat a motion to dismiss and subject a defendant to burdensome discovery simply by purporting to bring their claims on behalf of a class that might not be certified.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) (explaining that the Rules Enabling Act "forbids interpreting [Fed. R. Civ. P.] 23 to 'abridge, enlarge or modify any substantive right'" (citation omitted)).

38

In any event, even if the putative class in this case were ultimately certified, a damages award would still lead to discrimination.  Plaintiffs' putative class is limited to "residential mortgage loan borrowers who have been charged for LPI in connection with loans serviced by *GMACM*."  (A-179) (emphasis added).  But the LPI insurance programs offered by Defendants in Texas, New York, and New Hampshire are not limited to borrowers whose loans are serviced by GMACM, and the base rate schedules BIC and MIC filed with the applicable state insurance commissions are not pegged to particular mortgage servicers.  (A-472).  Therefore, allowing Plaintiffs potentially to recover damages would lead to discrimination among borrowers based on the happenstance of their mortgage servicer.

## POINT II

### THE COURT SHOULD REJECT PLAINTIFFS' ATTEMPTS TO AVOID THE FILED-RATE DOCTRINE

Despite the clear bar against claims alleging injury based on paying the filed rate, the district court allowed Plaintiffs' suit to go forward against Defendants.  Creating a new exception to the filed-rate doctrine, the district court reasoned that when a rate-regulated product is purchased by an intermediary—here, GMACM—the end-payor may bring a claim against both the intermediary and *the rate-filer* alleging that the end-payor was injured *by paying the filed rate*, even though the same filed rate would be "per se reasonable," *Wegoland Ltd.*, 27 F.3d at 18, if the product were purchased without the intermediary.  (SPA-12-13).  Separately,

Plaintiffs in their most recent filings have tried to recast the allegations of their SAC by insisting that their challenges have nothing to do with the LPI premiums. They contend that their allegations are "agnostic" about the LPI premium rates and are instead premised on the claim that Defendants conspired with GMACM to allow GMACM to overstate its costs to borrowers.  *See* Pls.' Ans. 16-18.

Both the district court's holding and Plaintiffs' latest attempt to circumvent the filed-rate doctrine suffer from the same basic flaw.  The doctrine bars any challenge in which the plaintiff alleges that "[t]he instrument by which" she was injured was the filed rate.  *Keogh*, 260 U.S. at 161.  That is exactly what Plaintiffs alleged in the district court.  *See* Pls. Mem. of Law in Opp. to Balboa Def. Mot. to Dismiss, Mar. 25, 2013, ECF No. 50, at 9 (stating that the Defendants' practice of charging Plaintiffs the full "filed rate[] is precisely what Plaintiffs allege was wrongful").  The fact that Plaintiffs—who are suing *insurance providers*—were charged the filed rate through an intermediary does not change the analysis.

### A.    There Is No Indirect-Purchaser Exception to the Filed-Rate Doctrine

The district court's decision to deny Defendants' motion to dismiss rested on an untenable carve-out to the filed-rate doctrine that has no basis in this Court's precedent.  Indeed, courts—including this one—have applied the doctrine regardless of whether the plaintiff purchased the regulated product directly from the rate filer or paid the filed rate to an intermediary.

40

For example, in *Wah Chang*, 507 F.3d 1222, the Ninth Circuit held that the filed-rate doctrine barred a claim by a retail purchaser of electricity who alleged that the wholesale electricity rates filed with Federal Energy Regulatory Commission ("FERC") had been manipulated and inflated by the defendants, energy companies who sold electricity to wholesale customers. Under the plaintiff's purchase contract with an intermediary, the rates it paid "were indexed to the wholesale spot market price," meaning that increases to the filed rate were directly passed on to the plaintiff by the intermediary. *Id.* at 1224. The Ninth Circuit concluded that the filed-rate doctrine applied because the plaintiff's claims "necessarily hinge on a claim that the FERC approved rate was too high." *Id.* at 1226. In doing so, the court rejected the argument that the plaintiff's claims fell outside the doctrine because "it did not directly purchase wholesale power" and was instead a "retail customer." *Id.* The court explained that the distinction was meaningless, because the plaintiff's claim that it paid inflated rates for electricity would "inevitably draft the courts into a determination of what rate" charged for wholesale electricity "would be fair and proper." *Id.*

This Court reached the same result in *Simon*. That case involved an action by another "retail consumer of electricity" alleging that electricity producers had conspired to increase capacity prices in the wholesale market. 694 F.3d at 198. The plaintiff alleged that he was harmed by the producers' conspiracy to increase

the filed rate for wholesale electricity because the third-party direct purchaser of the electricity "passed on 100% of its installed capacity costs to its consumers," including the plaintiff. *Id.* at 202. Even though the plaintiff purchased electricity through the intermediary (i.e., the third-party direct purchaser), and even though "FERC has exclusive authority over wholesale electricity rates" (not retail electricity rates), the Court held that the filed rate doctrine barred plaintiff's claims. *Id.* at 205. The Court explained that the plaintiff's claims were "based on the premise that he paid a supracompetitive price for electricity." *Id.* As a result, those claims impermissibly implicated the filed rate for wholesale electricity that FERC had approved. *Id.* at 207-08.

The district court did not discuss *Wah Chang* (even though Defendants cited it in their motion to dismiss), and it did not attempt to reconcile its holding with *Simon*'s application of the filed-rate doctrine to a "retail consumer." Instead, the district court focused on the wrong question—and was led astray in its analysis—when it asked "whether GMACM's purchase and forced-imposition of the rates that BIC/MIC filed and had approved is functionally equivalent to Plaintiffs purchasing hazard insurance from BIC/MIC directly." (SPA-9-10). Contrary to the district court, "'the focus for determining whether the filed-rate doctrine applies is the impact the court's decision will have on agency procedures and rate

42

determinations'" regardless of the plaintiff's precise relationship to the rate-filer. *Marcus*, 138 F.3d at 59 (quoting *H.J. Inc.*, 954 F.2d at 489).

There is thus nothing special about what the district court labeled A-to-B-to-C transactions (SPA-13), that nullifies application of the filed-rate doctrine. If, as is true here, an indirect purchaser's claims implicate the doctrine's nonjusticiability and nondiscrimination principles, then the doctrine applies and bars the plaintiff's claims. Indeed, courts have *even* "applied the filed-rate doctrine to claims brought against parties that did not file the rate at issue"—a circumstance not presented in Plaintiffs' suit against insurers—if the plaintiff's "claim, however disguised," is "seeking relief for an injury allegedly caused by the payment of a rate on file with a regulatory commission." *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 416, 419 (S.D.N.Y. 2009) (citation omitted; holding that the filed-rate doctrine barred a challenge alleging that the AARP received an improper allowance from an insurer, paid through insurance premiums, for sponsoring the group program), *aff'd*, 664 F. App'x 30 (2d Cir. 2010).[*]

---

[*] *See also Miller*, 994 F. Supp. 2d at 554 (holding that the filed-rate doctrine barred claims against a lender and mortgage servicer that were based on excessive LPI rates); *Royal Mile Co., Inc. v. UPMC*, No. 10-1609, 2013 WL 5436925, at *25 (W.D. Pa. Sept. 27, 2013) (applying the filed-rate doctrine to bar a claim alleging that a healthcare provider conspired with an insurer to impose inflated rates that would be passed on to patients because the asserted measure of damages was the difference between the filed rate charged by the insurer and a hypothetical lower rate that might have been charged absent the conspiracy); *Hooks v. Am. Medical Sec. Life Ins. Co.*, No. 06-cv-71, 2008 WL 3911130, at *6 (W.D.N.C. Aug. 19,

In failing to recognize that plaintiffs' claims directly violate the bedrock concerns of the filed-rate doctrine, the district court was distracted by the notion that LPI rates are charged to the mortgage servicer or borrower in the first instance. It reasoned that even though the *exact same LPI premium charge* was passed on to the borrower, the passed-on LPI charge was not necessarily "subject to the regulation scheme in the same way that insurance rates are."  (SPA-13) (internal quotation marks omitted).

The district court's reasoning failed in at least three respects.  First, as discussed above, even if the district court's assessment were accurate, the filed-rate doctrine would still apply.  The doctrine bars any challenge that implicates the reasonableness of the filed rate, and Plaintiffs' claim that two insurers and their affiliate conspired with GMACM to overcharge borrowers for LPI premiums surely qualifies.[*]

Second, state regulators understand that the LPI premiums they review and approve are charged to borrowers, as their actions in this field clearly demonstrate. The insurance filings expressly contemplate that the premiums will be passed on to

---

2008) (holding that the filed rate doctrine barred claims against an association that marketed a group insurance policy to association members).

[*]Indeed, another court in the Southern District rejected the regulatory oversight argument relied upon by the district court here for precisely this reason in dismissing claims against a lender and mortgage servicer based on the payment of "excessive premium rates" for LPI.  *See Miller*, 994 F. Supp. 2d at 554.

borrowers, as stated in standard mortgage contracts.  (A-182).  Moreover, state insurance regulators considering complaints about LPI rates have expressly provided for remedies directed *at borrowers*, in which the borrower receives relief directly from insurers who filed the rate.  For example, as Plaintiffs alleged in their SAC (A-202-06), the NYDFS recently conducted an extensive review of the LPI industry, and specifically investigated allegations that borrowers were being overcharged for LPI because of relationships and payments between mortgage servicers and insurers.  Plaintiffs omit the fact that the NYDFS's investigation culminated in consent orders with various industry participants, including BIC and MIC, and created a mechanism whereby borrowers could submit a claim directly *with insurers* (not with the mortgage servicer intermediary) to obtain a partial refund of LPI premiums paid.  (A-796).  Statements in the consent decree further demonstrate that the NYDFS recognizes that LPI premiums that are calculated from filed rates are passed on to borrowers.  *See, e.g.*, (A-798) ("While servicers choose the force-placed product for their mortgage loan portfolio, the high premiums are charged to homeowners.").  Statements and actions by other state insurance regulators illustrate the same understanding of LPI.  *See infra* Point III.B (discussing state regulatory action in this field).[*]

---

[*] Federal regulations also reflect the common-sense recognition that homeowners ultimately pay the LPI premiums that are filed with state insurance commissions. *See* 12 C.F.R. § 1024.37(a), (d)(2)(i)(D) (requiring mortgage servicers to provide

Third, the snippets from BIC and MIC rate-filings that the district court

relied upon do not support its reasoning.  (SPA-13-14).  The district court cited

language in BIC's New Hampshire submission for the proposition that lenders may

only charge borrowers for "allow[able]" portions of the LPI premium paid by the

lender.  The actual statement in the New Hampshire filing, however, is entirely

unremarkable; it merely acknowledges that if the lender obtains LPI coverage that

exceeds what is allowed by the mortgage contract, the lender will not pass that

portion of the LPI cost to the borrower.  (A-595).[*]  Moreover, the district court

missed the obvious point that the rate filing itself expressly contemplates that

borrowers (rather than lenders or mortgage servicers) ultimately pay LPI

---

homeowners with a notice of "the cost of force-placed insurance, stated as an
annual premium" before charging them for LPI.  And Plaintiffs' allegations
indicate that government-sponsored enterprise Fannie Mae shares this
understanding as well.  (A-198) ("Homeowners are billed for Lender Placed
Insurance premiums.").

[*] The full statement reads:

> This product was developed to provide coverage when it is requested
> by Mortgage Lenders or Servicers because a borrower has failed to
> provide insurance to protect the lender's interest in structures.  This
> insurance is to cover real property when it is required by the Mortgage
> Contract between the lender and borrower.  That agreement does not
> allow the lender to require a borrower to pay for coverage on items
> not mortgaged to secure the loan or for coverage that exceeds the
> coverage required in amount or peril by the mortgage contract.  This
> program is designed so that the lender pays the insurer for all
> premium and charges back only those parts of the premium which are
> allowed to be charged to the borrower.

(A-595).

premiums.  Here, Plaintiffs do not dispute that the full amount of LPI insurance

obtained by BIC and MIC was chargeable to them under their mortgage

agreements.  *Supra* Stmt of Case, § G.

The statements in MIC's New York filing similarly do not suggest that the

filed rate for LPI premiums would not be passed on to borrowers.  Indeed, one of

the statements quoted by the court came from a model notice to *borrowers*, which

discloses, *inter alia*, that the LPI borrowers will be charged for may not provide as

much insurance protection as they may want.  Moreover, as indicated, the

NYDFS's investigation of LPI rates—specifically referenced in the SAC (A-189-

91, 202-06)—demonstrates that New York regulators understand that the filed LPI

rates are passed on to borrowers.  (A-205) (quoting press release of NYDFS

investigation into whether the "high cost" of LPI inappropriately "adds to

struggling homeowners' debt burden").  Nothing in the cited filings supports the

district court's suggestion to the contrary.

Finally, permitting Plaintiffs to go forward just because they did not

purchase LPI directly from BIC or MIC would substantially dilute the filed-rate

doctrine, opening the rate-filing process up to judicial intrusion.  Under the district

court's reasoning, retail purchasers of electricity could bring claims alleging that

the filed wholesale rate that was passed on to them was too high.  *But see Simon*,

694 F.3d 205-08.  All LPI rates, whether pertaining to property insurance for

47

homeowners, mortgage insurance, car insurance, or other kinds of insurance, would be open to collateral attack by borrowers claiming they were injured by paying the filed rate. And numerous other arrangements in which an intermediary purchases a rate-regulated product and passes the full cost on to a third party, such as property management companies that pay for utilities and pass on rates to tenants, would lose filed-rate protection. This Court should reject the notion that the doctrine—which is to be "applied strictly," *Marcus*, 138 F.3d at 59—could be so easily circumvented.

## B. Plaintiffs' Attempt to Disguise Their Challenge to the Reasonableness of Filed Rates Fails

Plaintiffs also have contended that their claims do not implicate the filed-rate doctrine because they are not directed at the reasonableness of the LPI premiums themselves. But Plaintiffs' argument—which moves away from the district court's rationale[*]—cannot be squared with the SAC's allegations or with their general legal theory.

---

[*] Plaintiffs conceded in their opposition to the petition for an interlocutory appeal that the filed-rate doctrine bars at least some claims by borrowers challenging LPI premiums. Indeed, Plaintiffs acknowledged that several district court decisions dismissing claims by borrowers challenging LPI premiums based on "secret kickback" theories were *correctly* decided. *See* Pls.' Ans. 13-15 (discussing *Miller*, *DeCambaliza*, and *Roberts*, and indicating that "[o]bviously," the claims in those cases "challenged the reasonableness of the rates, and, hence, were barred by the filed-rate doctrine"). Plaintiffs even "disavow[ed]" the district court's description of their Complaint, insisting that they have never challenged "the manner in which GMACM selected Defendants, the manipulation of the force-

48

Plaintiffs now assert that their claims do not implicate their LPI premium rates—which they maintain are merely "coincident background"— because their only real complaint is that they were "fraudulently billed for LPI in excess of GMACM's true costs." Pls.' Ans. 17. This latest gambit to evade the filed-rate doctrine fails.

As an initial matter, Plaintiffs mischaracterize their own Complaint. Throughout the SAC, Plaintiffs allege that the LPI premiums were "inflated" by kickbacks to GMACM and that they were "overcharged" for LPI.[*] Moreover, Plaintiffs specifically allege that Defendants paid kickbacks to GMACM *with inflated LPI premiums* as a *quid pro quo* for GMACM's business.[**]

---

placed insurance process, or any kickbacks purportedly included in the premiums." Pls.' Ans. 17 (internal quotation marks and emphasis omitted).

[*] (A-174) (claiming that borrowers and loan owners "have been grossly overcharged for LPI"); (A-192) ("[T]he rebates/kickbacks represent a substantial percentage of the gross LPI premiums paid by GMACM."); (A-195) (describing "kickback arrangements that result in overcharges relating to LPI"); (A-197) (claiming that Fannie Mae learned that LPI "premiums may include or subsidize the cost of tracking services"); (A-204) (describing an NYDFS report questioning "whether premiums for [LPI] have been artificially inflated"); (A-211) (referring to "inflated LPI amounts"); (A-255) (claiming the purpose of the alleged RICO enterprise "was to induce borrowers to pay . . . overcharges in respect to [LPI] insurance").

[**] *See* (A-188) (alleging that money for tracking services is "derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI" and that "Newport derives compensation through GMACM's LPI premiums"); (A-189) ("Borrowers . . bear the cost to pay Newport through inflated LPI charges"); (A-254) (alleging that "GMACM's receipt of free tracking services" was "paid for

More fundamentally, Plaintiffs cannot avoid the fact that their claims inevitably depend on the allegation that BIC and MIC inflated the LPI premium rates that they filed with state insurance commissions.  As noted, Plaintiffs' basic contention is that BIC and MIC conspired with GMACM to overcharge Plaintiffs for LPI premiums and to use the overcharges to pay kickbacks to GMACM.  The trouble for Plaintiffs is that this "overcharge" was accomplished by billing Plaintiffs for premiums at the filed rate.  In order for the filed rate to represent an "overcharge," Plaintiffs must allege, explicitly or implicitly, that the filed rate itself included kickbacks—either by including impermissible costs or an excessive profit margin—that should not have been part of a reasonable LPI premium.  Thus, far from being "agnostic" about the LPI rates, Plaintiffs' claims inevitably depend on challenging both the rates and the integrity of the rate-approval process.

If there were any doubt about this, the fact that Plaintiffs are seeking relief from *insurance companies*, rather than from their mortgage servicer or lenders, should dispel it.  While Plaintiffs insist that their exclusive concern is with whether GMACM charged them for expenses that their mortgage agreements do not allow,[*]

---

indirectly through GMACM's LPI premiums"); (A-256) ("The money to pay the rebates/kickbacks is derived from GMACM's LPI insurance premiums."); (A-258) (alleging that NMC is compensated for tracking services "through the LPI insurance premiums").

[*] Plaintiffs' support for this premise is remarkably thin.  Plaintiffs appear to rely on standard language in mortgage agreements, providing that if a borrower fails to maintain hazard insurance, the lender "may obtain insurance coverage, at Lender's

Plaintiffs are *not* pursuing a claim against GMACM for breach of contract.[*]  Such a claim would likely still be barred by the filed-rate doctrine, because Plaintiffs' damages theory would almost certainly require the Court to calculate the difference between the filed rate and the supposed "true cost" of LPI that GMACM paid.  *See Miller*, 994 F. Supp. 2d at 553 (dismissing a breach of contract claim directed at the lender and mortgage servicer which was premised on the borrower's allegations that he "pa[id] excessive premium rates").  But this Court need not decide whether a narrowly targeted contract-based claim could go forward.  Plaintiffs do not allege (because they cannot) that Defendants were parties to the contracts between Plaintiffs and their lenders or that Defendants had any rights or responsibilities under those contacts.

Rather, this Court need only decide whether the filed-rate doctrine bars Plaintiffs' effort to seek treble damages *from insurance rate filers* for allegedly participating in a scheme to pay and then conceal kickbacks for LPI by including those kickbacks *in the filed LPI premium*.  That is not a close call.  Plaintiffs contend they were injured by paying the full LPI premiums; however, BIC and

---

option and Borrower's expense."  (A-182).  On its face, this language does not address what lender expenses for LPI are permissible.

[*] Plaintiffs did initially bring contract-based claims against GMACM, and then against Ally Financial, Inc. and Ally Bank based on an alter ego theory of liability. (A-271-277).  Defendants were not named in any of these state-law contract claims.  As noted above, Plaintiffs have voluntarily dismissed all of these claims with prejudice.  *Supra*, Stmt. of Case, § F.

MIC were legally required to charge that filed rate. And while Plaintiffs object that tracking fees are not a permissible LPI cost for GMACM to borrowers, they cannot allege that Defendants conspired to overcharge them for "the full price of LPI premiums" by offsetting the cost of tracking fees in the premiums (A-255-57), without challenging (at least implicitly) the reasonableness of the filed rate.

In short, Plaintiffs' purported distinction between their claims and the claims they recognize are barred by the filed-rate doctrine—claims by borrowers challenging the reasonableness of LPI premiums—is "one without a difference." *Marcus*, 138 F.3d at 60 (citation omitted). The doctrine's application turns on substance and thus cannot be evaded through attempts to rebrand a legal theory. *See id.* (rejecting the plaintiffs' attempt to rebrand the failed "fraud on the agency" exception as a "fraud on the consumer" exception); *Wegoland Ltd.*, 27 F.3d at 20 (rejecting the plaintiffs' argument that calculating "damages for fraud" is distinct from "determining the reasonableness of rates") (internal citation and emphasis omitted). Regardless of how plaintiffs characterize their allegations, the question is always "whether allowing the [plaintiffs] to pursue their claims . . . would undermine either of the two interests furthered by the filed-rate doctrine— nondiscrimination and nonjusticiability." *Marcus*, 138 F.3d at 60. Because Plaintiffs' claims would undermine those interests, their claims are barred.

## POINT III

## ANY ISSUES ABOUT LENDER-PLACED INSURANCE SHOULD BE ADDRESSED TO STATE INSURANCE REGULATORS

### A.    State Regulators Are Better Positioned Than Federal Courts to Address LPI Rates

Faithful application of the filed-rate doctrine to preclude the Plaintiffs'

collateral attack on the LPI rates charged by BIC and MIC will not leave borrowers

without recourse.  Instead, it will ensure that any legitimate concerns about LPI

rates are channeled to the appropriate venue:  state agencies with specialized

experience and expertise.

As this Court previously explained in *Wegoland Ltd.*, regulatory agencies

are far better equipped than federal courts to make the difficult discretionary

judgments and tradeoffs inherent to the rate-setting process:

> As compared with the expertise of regulating agencies, courts do not
> approach the same level of institutional competence to ascertain
> reasonable rates.  Regulators employ their peculiar expertise to
> consider the whole picture regarding the reasonableness of a proposed
> rate.  They make hundreds if not thousands of discretionary decisions
> about the submitted costs and ultimately arrive at the approved filed
> rate. Courts are simply ill-suited to systematically second guess the
> regulators' decisions and overlay their own resolution.

27 F.3d at 21.

Moreover, even "[a]part from th[is] institutional competency concern,

allowing courts to become enmeshed in the rate-making process would undermine

our current regulatory regime."  *Id.*  "Individual ratepayers" like Plaintiffs "are

unlikely to have any special knowledge of . . . alleged wrongdoing" regarding the filed rates "that would make it advantageous to have private enforcement through . . . RICO." *Id.* "By contrast, regulators who are intimately familiar with the industry are best situated to discover when regulated entities engage" in misconduct that leads to rate inflation. *Id.* As a result, the role of individual ratepayers is a limited one: they may "participat[e]in the political process and fil[e] complaints with the regulatory agencies," but they may not package their price complaints into a suit and seek "judicial intervention." *Id.*; *see also Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 317 (Minn. 2006) (upholding application of the filed-rate doctrine to bar challenges to insurance rates in part because the "legislature ha[d] substituted regulatory remedies to protect all policyholders in place of the private remedies that individual policyholders might possess").

If anything, federal court deference to rate setting by state agencies should be even greater in this context, which involves state agencies regulating the business of insurance. Under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, the states have the "dominant role in the regulation of insurance." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 115 (2d Cir. 2001). The Act recognizes that "[t]he business of insurance, and every person engaged therein," shall be subject to "the laws of the several States," and further provides that "[n]o

Act of Congress"—unless it specifically relates to insurance—"shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."  15 U.S.C. § 1012(a) and (b).

While the McCarran-Ferguson Act does not categorically bar all RICO suits that incidentally implicate insurance regulation, *see generally Humana, Inc. v. Forsyth*, 525 U.S. 299 (1999), courts have recognized that allowing private plaintiffs to pursue treble damages under RICO for supposedly fraudulent insurance practices may conflict with a state's regulatory scheme.  *See, e.g.*, *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 519 (6th Cir. 2010) (holding that the plaintiffs' RICO claims against an insurance company and its officers were "reverse preempted" under the McCarran-Ferguson Act because allowing a private action, with the possibility of treble damages, would "impair Ohio's insurance regulatory scheme"); *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640, 643 (8th Cir. 1999) (holding that the plaintiff's RICO suit against insurers was reverse preempted by Minnesota's insurance law for similar reasons). Here, allowing Plaintiffs to go forward with RICO claims seeking treble damages from insurers for their part in a supposed scheme to charge "inflated" LPI rates that they allegedly used to subsidize free tracking services would substantially impair the comprehensive regulatory schemes in place in Texas, New York, and New

Hampshire for reviewing those rates and determining that they are neither excessive nor inadequate.

### B.    State Agencies Have Actively Engaged in Oversight of LPI Rates

In recent years insurance regulators across the country have taken an active role in monitoring the industry, with a particular focus on how LPI rates affect homeowners.  For example, as Plaintiffs allege in their SAC (A-202-06), the NYDFS recently conducted an extensive review of the LPI industry, and specifically investigated allegations that borrowers were being overcharged for LPI.  In addition to entering consent orders with LPI insurers and providing borrowers with partial refunds from those rate filers, *supra* Point II.A, the NYDFS has proposed detailed regulations governing LPI submissions and LPI rates, including regulations governing the provision of tracking servicers by insurers and their affiliates.  *Supra* Stmt of Case, § E.  Notably, those proposed regulations (as well as the consent decrees) do *not* preclude insurers and their affiliates from engaging in insurance tracking without billing mortgage servicers for the full cost. To the contrary, the regulations recognize that tracking services may be undertaken for the "insurer's own benefit to identify and protect the insurer from exposure to lost premium and losses on properties in which no other insurance is in effect." NYDFS Proposed N.Y. Comp. Codes R. & Regs. tit. 11 § 227(g)(2); *see also* (A-794).  Thus, New York regulators recognize that tracking services can be a

legitimate insurance expense.  Moreover, in light of these developments, a federal court should not accept Plaintiffs' invitation to leap in front of state agencies in order to decide whether and to what extent borrowers paid "inflated" LPI premium rates to allegedly offset the cost of tracking services, and to categorize some portion of the value of tracking services as "overcharges."

Other state insurance agencies have also been engaged in the LPI context. In Texas, the TDI has conducted its own investigations of LPI and is directly involved with helping homeowners secure refunds when LPI is improperly obtained.  *Supra* Stmt of Case, § E.  Other state agencies have ordered partial refunds for homeowners or touted how the lower LPI rates they have approved will benefit borrowers.  *See* California Department of Insurance, *Press Release: Califoria Department of Insurance announces $20.6 million rate reduction for homeowners* (Jan. 31, 2013), *available at* http://www.insurance.ca.gov/0400-news/0100-press-releases/2013/release010-13.cfm (announcing 35% reduction in LPI rates for QBE Insurance Company); Florida Department of Insurance, *Press Release:  Office Approves Praetorian Insurance Company's Second Rate Filing for Lender-Placed Insurance* (Feb. 11, 2013), *available at* http://www.floir.com/PressReleases/viewmediarelease.aspx?id=2000 (announcing approval of rate filing that will result in decreased costs for consumers).

There is thus no reason to doubt whether state insurance regulators understand how LPI works or who ultimately pays the insurance premiums.  In fact, they are actively engaged in monitoring the industry and assessing the effect of LPI rates on homeowners.

## <u>CONCLUSION</u>

The district court's September 30 Order should be reversed, and the case should be remanded with instructions to enter judgment for Defendants.

Dated:      New York, New York
            September 24, 2014


                              Respectfully submitted,

                              **BUCKLEYSANDLER LLP**
                              *Counsel for Defendants-Appellants*


                    By:     /s/ Ross E. Morrison
                            ROSS E. MORRISON

Of Counsel:
Robyn C. Quattrone, Esq.
Katherine L. Halliday, Esq.

Goodwin Procter LLP
John C. Englander, Esq.

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of  Rule 32(a)(7)(B).  As measured by the word processing system used to prepare this brief, there are 13,694 words in this brief.

**BUCKLEYSANDLER LLP**
*Counsel for Defendants-Appellants*


By:    /s/ Ross E. Morrison
           ROSS E. MORRISON

SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Alison J. Nathan,
    entered September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-1

Order of the Honorable Alison J. Nathan, entered April 3, 2014 . . . . . .  SPA-35

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                :

LANDON ROTHSTEIN, ET AL.,         :
                   Plaintiffs,     :

      -v-                            :

GMAC MORTGAGE, LLC, ET AL.,     :
                   Defendants.    :
-------------------------------------------------------------------- X

12 Civ. 3412 (AJN)

<u>OPINION AND ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 3 0 2013

ALISON J. NATHAN, District Judge:

      Currently before the Court is a motion to dismiss the Second Amended Complaint

("SAC," or the "Complaint"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6),

filed by a group of Defendants in the above-captioned case. *See* Dkt. No. 44; *see also* Fed. R.

Civ. P. 12(b). This group of Defendants consists of Balboa Insurance Company ("BIC"),

MeritPlan Insurance Company ("MIC"), and Newport Management Company ("NMC")

(collectively, the "Balboa Defendants" or "Balboa"). The Balboa Defendants seek to dismiss

claims brought by Plaintiffs Landon Rothstein, Jennifer and Robert Davidson, and Ihor Kobryn,

on behalf of themselves and a putative class of similarly situated residential mortgage loan

borrowers who were charged for lender-placed insurance in connection with loans serviced by

GMAC Mortgage LLC ("GMACM"). Plaintiffs allege, *inter alia*,[1] violations of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), and the Real

Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA"). The Balboa

Defendants move to dismiss Plaintiffs' claims on the basis that: (1) they are barred by the filed

rate doctrine; and (2) the allegations against the Balboa Defendants fail to state a claim upon

which relief may be granted. For the reasons discussed herein, the Balboa Defendants' Motion

---

[1] The non-listed claims, Counts IV, V, VI, and VII, are not asserted against the Balboa Defendants and, thus, not
relevant to the resolution of the Balboa Defendants' pending motion. *See* SAC ¶¶ 314-351.

to Dismiss, Dkt. No. 44, is granted in part and denied in part.

## I.    STANDARD OF REVIEW

"In resolving a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), 'the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.'" *Guan N. v. NYC Dep't of Educ.*, No. 11 Civ. 4299 (AJN), 2013 WL 67604, at *2 (S.D.N.Y. Jan. 7, 2013) (quoting *Natural Res. Def. Council v. Johnson,* 461 F.3d 164, 171 (2d Cir. 2006)). However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir. 2011) ("[Plaintiff] must allege facts that affirmatively and plausibly suggest that it has standing to sue.").

In contrast, "[w]hen deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Guan N.*, 2013 WL 67604, at *2 (citing *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir. 2007)). To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint containing nothing more than "a formulaic recitation of the elements of a cause of action" is insufficient, and the Court need not assume the truth of mere conclusory statements. *Id.*

"In addition to the allegations of the pleading itself, the Court may consider documents

2

attached as exhibits or incorporated by reference." *TufAmerica, Inc. v. Diamond*, No. 12 Civ.

3529 (AJN), 2013 WL 4830954, at *1 (S.D.N.Y. Sept. 10, 2013) (citing *Halebian v. Berv,* 644

F.3d 122, 131 n.7 (2d Cir. 2011); and *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 234

(2d Cir. 2008)). "The Court may also take judicial notice of filings with government agencies

that are a matter of public record." *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 415 (S.D.N.Y.

2009), *aff'd* 379 F. App'x 30 (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d

Cir. 1998) (noting that a "district court may rely on matters of public record in deciding a motion

to dismiss under Rule 12(b)(6)"); and *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.

1991) (documents publicly filed with the SEC may be considered on a motion to dismiss)). "If a

document relied on in the complaint contradicts allegations in the complaint, the document, not

the allegations, control, and the court need not accept the allegations in the complaint as true."

*Poindexter v. EMI Record Grp. Inc., No.* 11 Civ. 559 (LTS), 2012 WL 1027639, at *2 (S.D.N.Y.

Mar. 27, 2012) (citing *Barnum v. Millbrook Care Ltd. P'ship,* 850 F. Supp. 1227, 1232-33

(S.D.N.Y. 1994)).

## II.   BACKGROUND

In their Complaint, Plaintiffs allege that Defendants engaged in unlawful practices

relating to the somewhat complicated lender-placed insurance process. Because of the nature of

this process, there is some benefit to first providing a hypothetical example of how the process

generally functions before addressing Plaintiffs' allegations regarding Defendants' actions

relative to the process.

In this hypothetical example, an imaginary couple, Alex and Carol, decide to purchase a

residential home. They go to a lender, Bank, who issues them a mortgage. The terms of that

mortgage provide that, if Alex and Carol do not maintain hazard insurance on their home, Bank,

3

as the lender, can purchase hazard insurance and bill the cost to Alex and Carol. Aptly, this product is called lender-placed insurance ("LPI").

The idea behind LPI is that, although Alex and Carol live in the home, Bank maintains an interest in their home, in the amount of the unrepaid portion of the mortgage that could be lost in the event of a hazard. Bank is not, however, concerned about or required to insure Alex and Carol's principal or belongings. As is custom though, instead of Bank owning the interest in Alex and Carol's mortgage, it securitizes the mortgage and sells it to a securitization trust, Trust, which then owns the legal title to the mortgage and is the party interested in assuring that the home is insured. Trust, in turn, hires Servicer to manage day-to-day details (like insurance) regarding the mortgages. Servicer, in turn, may hire Subcontractor to undertake some of the tasks that Trust hired Servicer to perform.

Alex and Carol, meanwhile, allow their hazard insurance to lapse. Subcontractor, who is keeping tabs on their mortgage, gets wind of this and sends them a notice reminding them of their obligation to maintain hazard insurance and informing them that, if they don't rectify the situation, Servicer will purchase LPI at a specific rate and that LPI may be more expensive than private insurance and may not cover their principal, equity or belongings. Despite the warning, Alex and Carol do not remedy the situation. As a result, Servicer exercises Trust's right, pursuant to the mortgage agreement, and purchases LPI from Insurer. After Insurer bills Servicer, Servicer (through Subcontractor) tells Alex and Carol that it has purchased LPI for their property and that the amounts it paid for the LPI are now included in their mortgage.

With that general overview in mind, the Court turns to Plaintiffs' allegations here.

## III.    FACTS[2]

---

[2] Except as otherwise noted, the following facts are derived from the Complaint and the other documents discussed above, which the Court may appropriately consider at this time. Unless otherwise noted, the Court accepts as true

In this case, Plaintiffs, and the members of their putative class (individuals like Alex and Carol, in the above hypothetical), allege that, since at least March 2003, GMACM (Servicer) and BIC/MIC (Insurer), engaged in fraudulent activity related to the above-described system, and that, as a result, Plaintiffs were unlawfully overbilled for LPI. Specifically, Plaintiffs allege that GMACM -- the fifth largest residential loan servicer in the United States -- had an agreement with BIC/MIC whereby GMACM would purchase LPI for the loans it serviced from BIC/MIC and that BIC/MIC would then provide GMACM with kickbacks. According to Plaintiffs, these kickbacks came in two forms: first, GMACM hired NMC (Subcontractor), an affiliate/agent of BIC/MIC, to perform GMACM's "insurance tracking," but BIC/MIC secretly paid NMC's bills for GMACM, thus providing NMC's subcontractor services to GMACM for free; and second, BIC/MIC would funnel a portion of the LPI payments that it received from GMACM to a third party, John Doe, who would covertly return those amounts to GMACM. Notwithstanding having received these kickbacks, GMACM would then bill Plaintiffs for the full cost of the LPI it had originally paid to BIC/MIC, rather than billing them for the post-kickback cost that GMACM had effectively paid for that LPI.

Plaintiffs allege that Defendants and GMACM constituted a RICO "enterprise," the purpose of which was to defraud borrowers, like Plaintiffs, by inducing them to pay overpriced LPI with respect to GMACM-serviced loans. SAC ¶¶ 253-55. Plaintiffs recognize that the original cost for the LPI that GMACM purchased from BIC/MIC was calculated using rates that had been filed with, and approved by, the relevant state insurance regulator. Plaintiffs claim, however, that Defendants fraudulently misrepresented the fact that the costs billed did not, in fact, reflect the costs that GMACM had actually paid for the LPI. Specifically, they claim that

---

the facts as alleged in the Complaint.

statements in the letters -- describing the LPI charges as "[t]he cost of the insurance" that was "advanced," and calling the relevant payments "reimburs[ments]" -- were materially false and intended to trick the borrower into believing that they were billed the same amount as BIC/MIC paid. In relevant part, Plaintiffs claim that Defendants' actions were in violation of the RICO and RESPA statutes. Additional facts will be discussed within the body of this opinion as they become relevant.

## IV.    DISMISSAL UNDER THE FILED RATE DOCTRINE

As noted, the Balboa Defendants argue that Plaintiffs' claims should be dismissed pursuant to what is called the "filed rate doctrine," which bars claims of unreasonable rates against utilities whose rates are regulated. Defendants argue that dismissal is not just appropriate, but mandatory, because the filed rate doctrine bars any claims challenging the LPI premiums that Plaintiffs were billed for, which were based on insurance rates that applicable state regulators approved. Br. 6. As such, they argue, Plaintiffs are prohibited under the filed rate doctrine from "challenging those approved rates, any specific component of the rates, or the premiums calculated from the rates in a private civil action." Br. 8. Plaintiffs argue that the filed rate doctrine does not apply because the rates at issue were not filed and approved, as required for that doctrine to bar suit. For the reasons discussed below, the Court concludes that Defendants have not demonstrated that dismissal is appropriate at this point in litigation pursuant to the filed rate doctrine.

### A.    Filed Rate Doctrine Background

"The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). This doctrine, "sometimes referred to as the filed tariff doctrine, protects

6

both the utility and the customer." *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d

565, 573 (S.D.N.Y. 1999) (Chin, *J.*). "Simply stated, the doctrine holds that any "filed rate" --

that is, one approved by the governing regulatory agency -- is per se reasonable and unassailable

in judicial proceedings brought by ratepayers." *Wegoland Ltd.*, 27 F.3d at 18.

Since recognizing the doctrine in *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S.

156 (1922), the Supreme Court's filed rate doctrine precedent has focused on "two

corresponding interests, one concerned with potential 'discrimination' in rates as between

ratepayers, and the other concerned with the 'justiciability' of determining reasonable rates." *Id.*

(*comparing Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 126-28 (1990)

(emphasizing "nondiscrimination strand"), *and Arkansas Louisiana Gas Co. v. Hall*, 453 U.S.

571, 579 (1981) (focus on "uniform rate regulation"), *with Montana-Dakota Utils. Co. v.

Northwestern Pub. Serv. Co.*, 341 U.S. 246, 261 (1951) (reasonableness of rate is best left to the

agency), *and Square D. Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986)).

As the Second Circuit has recognized, "two companion principles lie at the core of the

filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting

uniform rates, and second, that courts are not institutionally well suited to engage in retroactive

rate setting." *Wegoland, Ltd.*, 27 F.3d at 19 (quoting *Wegoland, Ltd. v. NYNEX Corp.*, 806 F.

Supp. 1112, 1115 (S.D.N.Y. 1992)). "When the filed rate doctrine applies, it is rigid and

unforgiving. Indeed, some have argued that it is unjust." *Simon v. KeySpan Corp.*, 694 F.3d

196, 205 (2d Cir. 2012) (citing, *inter alia*, *Fax Telecommunicaciones Inc. v. AT & T*, 138 F.3d

479, 491 (2d Cir. 1998)). "It does not depend on 'the culpability of the defendant's conduct or

the possibility of inequitable results,' nor is it affected by 'the nature of the cause of action the

plaintiff seeks to bring.'" *Simon*, 694 F.3d at 205 (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46,

7

58 (2d Cir. 1998)). And when the doctrine applies, it bars both state and federal claims. *Hall*, 453 U.S. at 584-85.

### B. Parties' Arguments

Defendants argue that Plaintiffs' allegations "clearly implicate" both the "nondiscrimination and nonjusticiability strands of the filed rate doctrine." Br. 8. First, they argue, the claims implicate the nonjusticiability strand of the doctrine because the Court will need to review "Plaintiffs' filed and approved LPI rates, because the alleged overcharges were a portion of Plaintiffs' insurance premiums, which themselves are set based on the rates." Br. 8. And second, the claims implicate the nondiscrimination aspect of the doctrine because "if Plaintiffs were able to recover as damages the portions of their LPI premiums that allegedly included the 'rebates/kickbacks,'" they would effectively be paying less than the filed and approved LPI rate. Br. 9.

Plaintiffs contest the purported effect of the filed rate doctrine on their claims. They argue that the filed rate doctrine does not apply to their claims because the "precise charges at issue -- LPI cost reimbursements purportedly due under mortgage loan agreements -- were not so filed or approved." Opp. 8. Plaintiffs argue that Defendants' "unilateral choice to 'base' an unfiled, unapproved charge on a filed rate" does not "somehow render[] the unfiled charge also a filed rate." Opp. 8. They argue that, pursuant to Second Circuit precedent, the filed and approved tariff or rate must cover "the actual service rendered to users of [Defendants'] billing system," and that Defendants have failed to "identify any filed tariff 'actually' covering LPI cost reimbursements purportedly due under mortgage loan agreements." Br. 9 (quoting *F.T.C. v. Verity Int'l Ltd.*, 443 F.3d 48, 62 (2d Cir. 2006)). Plaintiffs contend that the arguments regarding nonjusticiability have "no merit," because they are in no way challenging the reasonableness of

the rates themselves, but instead are challenging Defendants' ability or entitlement to

"overcharge[] them for 'reimbursement' of GMACM's LPI 'costs.'"  Opp. 11.

### C.    Analysis

The facts at issue with regard to the application of the filed rate doctrine are as follows.

Each Plaintiff signed a mortgage loan agreement with GMACM, pursuant to which they were

required to purchase and maintain hazard insurance on their properties.  In relevant part, this

portion of the mortgage loan agreement provided as follows:

> If Borrower fails to maintain [hazard insurance] Lender may obtain insurance
> coverage at Lender's option and Borrower's expense.  Lender is under no
> obligation to purchase any particular type of coverage.  Therefore, such coverage
> shall cover Lender, but might or might not protect Borrower, Borrower's equity in
> the Property, or the contents of the Property, against any risk, hazard or liability
> and might provide greater or lesser coverage than was previously in effect . . . .
> Any amounts disbursed by Lender under this Section 5 shall become additional
> debt of Borrower secured by this Security Instrument.

SAC ¶ 48.

As to each Plaintiff, after sending warning letters regarding the fact that they had not

submitted proof of hazard insurance, Cahen Decl. Exs. 1-9, GMACM exercised its rights under

the above quoted provision of the mortgage loan agreement and force-purchased hazard

insurance through either BIC or MIC.  Subsequently, and also pursuant to the mortgage loan

agreement, the amounts GMACM paid to BIC/MIC for purchasing the hazard insurance were

added to the overall debt that each Plaintiff owed to GMACM.

There is no dispute that the relevant rate charged by BIC/MIC for the insurance was filed

and approved.  Opp. 9 ("To be sure, the filed rate doctrine governs the premiums that Balboa

charged GMACM.").  There is also no dispute that had Plaintiff purchased hazard insurance

from BIC/MIC at these same rates, the filed rate doctrine would bar them from challenging those

rates.  The question, rather, is whether GMACM's purchase and forced-imposition of the rates

that BIC/MIC filed and had approved is functionally equivalent to Plaintiffs purchasing hazard insurance from BIC/MIC directly.  On the one hand, Defendants argue that there is no difference between these two scenarios, as the end result in each is Plaintiffs being charged a filed and approved rate for hazard insurance.  On the other hand, Plaintiffs argue that the scenarios are different, because the amounts that they were charged was a cost reimbursement based on BIC/MIC's filed and approved rate, it was not itself a filed and approved rate.  Pl. Br. 8.

Although no court in this district has directly addressed it, a number of courts in districts across the country have recently confronted this same question and been asked to address this same distinction.  Most recently, in *Simpkins v. Wells Fargo Bank, N.A*, No. 12 Civ. 0768, 2013 WL 4510166 (S.D. Ill. Aug. 26, 2013), as in the current case, the court was asked to address allegations of kickbacks relative to force-placed insurance.  On the question of the applicability of the filed rate doctrine, Chief Judge Herndon noted that "recently, some courts have begun to view cases such as the one before the Court, not so much as a challenge to the legal rates charged, but rather as a challenge to the manner in which the defendants select the insurers, the manipulation of the force-place insurance policy process, and the impermissible kickbacks included in the premiums."  *Id.* at *14 (citing *Kunzelmann v. Wells Fargo Bank, N.A.,* No. 9:11-cv-81373, 2012 WL 2003337, at *3 (S.D. Fla. June 4, 2012); *Gallo v. PHH Mortg. Corp.,* 916 F. Supp. 2d 537, 545-46 (D.N.J. 2012); *Abels v. JPMorgan Chase Bank, N.A.,* 678 F. Supp. 2d 1273, 1277 (S.D. Fla.2009); *Alexander v. Washington Mut., Inc.,* No. CIV.A. 07-4426, 2008 WL 2600323, at *2 (E.D. Pa. June 30, 2008); and *Stevens v. Citigroup,* No. CIV.A. 00-3815, 2000 WL 1848593, at *1 (E.D. Pa. Dec.15, 2000)); *see also Leghorn v. Wells Fargo Bank, N.A.* No. C-13-00708, 2013 WL 3064548, at *6 (N.D. Cal. Jun. 19, 2013).

Also as in this case, the defendants in *Simpkins* urged the Court to instead look to *Roberts*

10

*v. Wells Fargo Bank, N.A.*, No. 12 Civ. 200, 2013 WL 1233268 (S.D. Ga. Mar. 27, 2013); *see also* Reply 4-6. In *Roberts*, the court questioned the holding in *Kunzelmann* and *Abels*, as well as the overall distinction between challenges to "the method of choosing an insurer" versus challenges to the filed rates themselves. *Roberts*, 2013 WL 1233268, at *12-13. The court found the distinction that the other courts had drawn "dubious," particularly because calculating damages in cases like the one before it would require the Court to impermissibly make "a judicial determination of the reasonableness of the rate," which it argued would bring challenges of that type within the nonjusticiability front of the filed rate doctrine. *Id.* at *13 (quoting *Hill v. BellSouth Telecomm., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004)) (citing *Hall*, 453 U.S. at 577).

In *Simpkins*, Judge Herndon rejected the defendants' offer to follow *Roberts*. *Simpkins*, 2013 WL 4510166, at *14 n.1 ("[T]his Court does not agree that the filed rate doctrine was intended to sanction the duplicative coverage, back dated policies, and kickbacks that are alleged in the complaint."). Instead, that court joined with the earlier-cited cases, concluding that payments made to the lender "pursuant to . . . side agreements are not subject to regulatory scheme in the same way that insurance rates are," and that, as a result, the plaintiffs were not "barred under the filed rate doctrine from challenging conduct which [was] not otherwise addressed by a governing regulatory agency, particularly where defendants bear the burden on the issue of dismissal." *Id.; see also Gallo*, 916 F. Supp. 2d at 546 (denying motion to dismiss where defendants had not demonstrated that the "pre-arranged side agreements [we]re similarly filed with, approved by, or regulated and monitored in some way by a governing regulatory agency, such as the Department of Insurance, much like the filed rates fort hazard insurance policies themselves").

Defendants in this case maintain that the Court should follow *Roberts* and argue that the

11

cases discussed above "are contrary to . . . Second Circuit authority . . . which holds that the filed

rate doctrine bars claims where a damages award would cause plaintiffs to pay different rates for

the same insurance coverage." Reply at 5 n.4 (citing *Marcus v. AT&T Corp.*, 138 F.3d 46, 60

(2d Cir. 1998); and *Wegoland*, 27 F.3d at 21-22). Defendants' argument fails both legally and

factually.

As a legal matter, the cases Defendants cite do not support the conclusion that the line of

cases discussed in *Simpkins* are "contrary" to Second Circuit precedent or demonstrate that

precedent in this Circuit is distinguishable from that of other circuits. In *Wegoland*, where the

plaintiffs sought a fraud-on-the-regulators exception to the filed rate doctrine, the Circuit Court

drew directly from Supreme Court precedent regarding nonjusticiability and nondiscrimination

in holding that there was no fraud exception to the filed rate doctrine. In *Marcus*, where AT&T

customers challenged a filed but unpublicized tariff that allowed AT&T to round call-lengths up

to the nearest minute, the Circuit Court concluded that the damages claim was barred because the

calculation of damages "would implicate the nondiscrimination and nonjusticiability strands of

the filed rate doctrine." *Marcus*, 138 F.3d at 60. What these cases show is that, rather than

establishing a unique Second Circuit approach to the application of the filed rate doctrine, the

Second Circuit instead strictly adheres to and applies Supreme Court precedent regarding

nonjusticiabiility and nondiscrimination. Defendants do not show how these decisions are

uniquely applicable to the current discussion or what separates Second Circuit precedent from

the relevant precedent in the other circuits. Nor do Defendants provide any case law from those

Circuits to support such an argument or distinction.

Defendants' argument also fails because it does not address the critical factual

distinctions -- which are the heart of the question before the Court -- between the current case

12

and cases like *Wegoland* and *Marcus*.  In both of those cases, the plaintiffs alleged that the filed

rates, which the plaintiffs themselves were being charged, were artificially inflated.  Here, on the

other hand, "Plaintiffs do not allege that Balboa's rates were unreasonable," Opp. 11, but instead

challenge the imposition of those rates on them by a third party, GMACM.  That is, whereas

*Wegoland* and *Marcus* involved a simple A-to-B transaction -- in which A, the insurer, approved

a rate and charged it to B -- the current case is less simple.  Here, A (BIC or MIC) received

approval from the state regulators to charge a certain rate to insurers, after which B (GMACM)

billed C (Plaintiffs) for the insurance it had purchased from A.

Defendants, who bear the burden of demonstrating that dismissal is justified under the

filed rate doctrine, have not provided the Court with any authority to demonstrate that amounts

billed in this second scenario are "similarly filed with, approved by, or regulated and monitored

in some way by a governing agency, such as the Department of Insurance, much like the filed

rates for hazard insurance policies themselves." *Gallo*, 916 F. Supp. 2d at 546; *accord Simpkins*,

2013 WL 451066, at *14.  As in *Gallo* and *Simpkins*, without such authority, the Court cannot

conclude that the amounts billed to Plaintiffs for the cost of an insurance agreement between

GMACM and BIC/MIC are "subject to the regulatory scheme in the same way that insurance

rates are." *Gallo*, 916 F. Supp. 2d at 546; *Simpkins*, 2013 WL 451066, at *14.

If anything, the documents Defendants submitted in support of their argument work

against their making the necessary showing.[3]  First, the relevant documents show that the rates

that BIC/MIC filed and that were reviewed by the relevant regulatory agencies were rates set for

lenders purchasing insurance and were designed to protect the lenders interest in the property.

*See* Petersen Decl. Ex. B., Dkt. No. 45-2 at 51 ("[T]he insurance purchased is intended for the

benefit and protection of the NAMED INSURED, insures against LOSS only to the

---

[3] As Defendants note, these documents are incorporated by reference into the Complaint.

13

COMMERCIAL PROPERTY on the DESCRIBED LOCATION, and may not sufficiently protect the BORROWER'S interest in the COMMERCIAL PROPERTY.") (emphasis in original); *id.* at 104 (describing the insurance program as "a commercial fire and allied lines program that is *sold to large financial institutions* (lenders), to cover *their* interest in property on which they have issued mortgages.") (emphasis added); *id.* ("[T]he lender is the policyholder and the coverage amount is the mortgage on each covered property."). Second, as the letter they submitted to the New Hampshire Insurance Department specifically notes, in at least that instance, Defendants had been granted approval for the rate based in part on their assertion that only "allow[able]" portions of the amounts that the lender paid to the insurer would be charged to the borrower. Pettersen Decl. Ex. C., Dkt. No. 45-3 at 2 ("Th[e] program is designed so that the lender pays the insurer for all premium and charges back only those parts of the premium which are allowed to be charged to the borrower.").

Drawing all reasonable inferences in the light most favorable to Plaintiffs, it would be fair to infer from these facts that the filed and approved rates were not meant to be directly applicable to individual residential mortgage loan borrowers, like Plaintiffs, and that these rates were not approved for the direct application to such individuals. Defendants have provided no authority to support the contention that the Court can, should, or must grant "per se reasonable" status to rates designed and approved for lenders when those rates are secondarily billed by the lenders to borrowers instead. Accordingly, here, as in *Simpkins*, "Plaintiffs should not be barred under the filed rate doctrine from challenging conduct which is not otherwise addressed by a governing regulatory agency, particularly where defendants bear the burden on the issue of dismissal." *See Simpkins*, 2013 WL 4510166, at *14. As such, Defendants are not entitled to dismissal of Plaintiffs claims against them on this basis and the Court will now turn to

14

Defendants' arguments for why Plaintiffs' alleged RICO and RESPA violations should be dismissed, pursuant to Rule 12(b)(6), for failure to state a claim.

## V.    PLAINTIFFS' RICO CLAIMS

Defendants argue that the alleged RICO and RICO conspiracy claims (Counts One and Two) SAC ¶¶ 251-298, should be dismissed for failure to state a claim upon which relief can be granted.

### A.    Plaintiffs' Allegations

Count One of the Complaint alleges, against all Defendants, a violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968. SAC ¶¶ 251-283. As Plaintiffs describe it, at base, the RICO claim alleges that Defendants engaged in a scheme to overcharge in the course of a contract, in violation of 18 U.S.C. § 1962(c). Opp. 2. Specifically Plaintiffs allege that the Balboa Defendants directly participated in the racketeering enterprise by "pa[ying] kickbacks to GMACM, disguise[ing] those kickbacks by funneling them through an affiliate, and prepar[ing] and issu[ing] fraudulent and extortionate mailings." Opp 1. To satisfy the RICO requirement that there be at least two predicate offenses committed in the previous ten years, *see* 18 U.S.C. § 1961(5), Plaintiffs allege that Defendants engaged in mail fraud and wire fraud, including honest services fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and extortion, attempted extortion, and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951(a).

The overall scheme is described above, in the background section, and specific details will be added as they become relevant. Generally, however, in this claim Plaintiffs allege that, in violation of 18 U.S.C. § 1962(c), Defendants and GMACM engaged in a pattern of racketeering activity, whereby:

15

(1) GMACM entered into servicing agreements with owners/holders of whole loans, pursuant to which GMACM was required to maintain continuous hazard insurance on the secured properties;

(2) As necessary, GMACM bought LPI for the loans it serviced from BIC and MIC and paid the filed rate for that product;

(3) GMACM hired NMC, an affiliate and agent of BIC/MIC, to serve as GMACM's subcontractor, performing "loan tracking" services;

(4) Defendants and GMACM concealed from the public borrowers and loan owners the fact that GMACM was not required to pay NMC for the "loan tracking" services;

(5) Additionally, BIC/MIC would rebate/kickback a percentage of the GMACM's purchase price for the LPI as "commissions," and do so by routing the payments through "John Doe," who then forwards these amounts on to GMACM;

(6) GMACM retains the "bogus commissions," and benefits from the free tracking service, but bills the borrower for the full, original amount GMACM paid to BIC/MIC for the LPI, and these amounts are added to the "top of borrowers' mortgage payment," meaning that borrowers' payments would go to paying off the LPI before any of the payment would be applied to the principal/interest on the underlying mortgage; and

(7) NMC computes the amount purportedly due and issues notices stating the amount due as GMACM's pre-rebate amount due. These notices "falsely describe the balances as reflecting the 'cost of coverage' and the amounts necessary to 'reimburse' GMACM for moneys 'advanced,'" SAC ¶ 263; *see also* Cahen Decl. Ex. 8 ("You are responsible for reimbursing us for the cost of this coverage in the amount of

16

$\underline{\hspace{1cm}}$.00. ('insurance charges').").

## B.    RICO Requirements

The RICO statute provides a private cause of action for "[a]ny person injured in his

business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. §

1964(c).  "Congress enacted RICO in 1970 as part of the Organized Crime Control Act 'to seek

the eradication of organized crime in the United States.'"  *Am. Fed. Of State, Cnty. And Mun.*

*Emps. Dist. Council 37 v. Bristol-Myers Squibb Co.*, No. 12 Civ. 2238 (JPO), 2013 WL

2391999, at *3 (S.D.N.Y. Jun. 3, 2013) (quoting Pub. L. No. 91-452 (1970)).  Pursuant to the

statute, it is "unlawful for any person employed or associated with any enterprise . . . to conduct

or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern

of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

To state a plausible civil claim for violation of RICO § 1962(c), Plaintiffs' pleadings

"must demonstrate, as to each defendant, that while employed by or associated with an enterprise

engaged in interstate or foreign commerce, and through the commission of at least two predicate

acts constituting a 'pattern of racketeering,' the defendant directly or indirectly conducted or

participated in the conduct of the affairs of such enterprise."  *Gross v. Waywell,* 628 F. Supp. 2d

475, 485 (S.D.N.Y. 2009) (citing 18 U.S.C. § 1962(c); *Spool v. World Child Int'l Adoption Ag.,*

520 F.3d 178, 183 (2d Cir. 2008)).  "To establish a civil RICO claim, a plaintiff must allege '(1)

conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury

to business or property as a result of the RICO violation.'"  *Lundy v. Catholic Health Sys. of*

*Long Island Inc.,* 711 F.3d 106, 119 (2d Cir. 2013) (citations omitted); *see also Cruz v. FXDirect*

*Dealer LLC,* 720 F.3d 115, 120 (2d Cir. 2013) ("To establish a RICO claim, a plaintiff must

show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property;

17

and (3) that the injury was caused by the violation of Section 1962."). "The pattern of racketeering activity must consist of two or more predicate acts of racketeering." *Cruz*, 270 F.3d at 119. (citing 18 U.S.C. § 1961(5)).

Pursuant to Supreme Court precedent, "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle v. United States,* 556 U.S. 938, 944 (2009) (citation omitted). The true civil RICO plaintiff may well provide a laudatory societal service, supplementing the government's efforts "to protect the general public and the common good from felonious conduct." *Gross,* 628 F. Supp. 2d at 481 (citing *Agency Holdg. Corp. v. Malley-Duff & Assocs.,* 483 U.S. 143, 151 (1987)). "Yet it is well known that the federal courts are flooded with cases molded to the RICO form, even though they are truly little more than garden variety claims for fraud." *Bristol-Myers Squibb Co.*, 2013 WL 2391999, at *4 (citing *Rosenson v. Mordowitz,* No. 11 Civ. 6145, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012)). "Consequently, courts have an obligation to scrutinize civil RICO claims early in the litigation [to] separate the rare complaint that actually states a claim for civil RICO from more obviously alleging common law fraud." *Rosenson,* 2012 WL 3631308, at *4.

Although Defendants' specific arguments will be discussed below, generally, they argue that Plaintiffs have failed to state a RICO claim, under 18 U.S.C. § 1962(c), because they have failed to allege: (1) that the Balboa Defendants committed any RICO predicate offense; (2) that the Balboa Defendants participated in the operation or management of the RICO empire; and (3) that the purported RICO violations caused an injury to Plaintiffs' business or property. For the following reasons, and accepting all well-pleaded facts as true, the Court concludes: first, that Plaintiffs have sufficiently pleaded the facts and predicate acts necessary to allege a RICO violation, pursuant to 18 U.S.C. § 1962(c); and second, that Plaintiffs have also pleaded the facts

18

necessary to establish a RICO conspiracy violation, pursuant to 18 U.S.C. § 1962(d).

### C.     Predicate Act: Mail Fraud/Wire Fraud

"To prove a violation of the mail fraud statute, plaintiffs must establish the existence of a

fraudulent scheme and a mailing in furtherance of the scheme." *Lundy*, 711 F.3d at 119 (quoting

*McLaughlin v. Anderson,* 962 F.2d 187, 190-91 (2d Cir. 1992)). "If a party intends to allege that

communications constitute predicate acts of mail or wire fraud, it must allege the following

elements of those offenses:  (1) the existence of a scheme to defraud, (2) defendants' knowing

participation in such a scheme, and (3) the use of wire or mail communications in interstate

commerce in furtherance of that scheme." *MLSMK Inv. Co. v. JP Morgan Chase & Co.,* 737 F.

Supp. 2d 137, 142 (S.D.N.Y. 2010) (quotation marks and citations omitted).  The existence of a

scheme to defraud, itself, consists of three sub-elements:  "(1) the existence of a scheme to

defraud; (2) fraudulent intent on the part of the defendant; and (3) the materiality of the

representations." *Boritzer v. Calloway,* No. 10 Civ. 6264 (JPO), 2013 WL 311013, at \*6

(S.D.N.Y. Jan. 24, 2013) (internal citations and quotation marks omitted); *see also Bristol-*

*Myers*, 2013 WL 2391999, at \*4 (same)

Courts have noted that RICO allegations "merit particular scrutiny [if], as here, the

predicate acts are mail and wire fraud, and [if] the use of mail or wires to communicate is not in

and of itself illegal, unlike other predicate acts such as murder or extortion." *Rosenson,* 2012

WL 3631308, at \*4 n.3; *accord Bristol-Myers*, 2013 WL 2391999, at \*4.  Moreover, "RICO

claims based on mail and wire fraud are subject to the heightened pleading standard established

by Rule 9(b), which provides that '[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.'" *Bristol-Myers*, 2013 WL

2391999, at \*5 (quoting Fed. R. Civ. P. 9(b)) (citing *McLaughlin,* 962 F.2d at 191 (noting that

19

Rule 9(b)'s heightened pleading standard applies where mail fraud is alleged as a RICO predicate offense)). To satisfy the Rule 9(b) particularity requirement, a complaint alleging fraud must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also Bristol-Myers*, 2013 WL 2391999, at *5 (applying Rule 9(b) to mail and wire fraud charges in the RICO context); *Lundy*, 711 F.3d at 119 ("Bare-bones allegations do not satisfy Rule 9(b).").

Defendants argue that Plaintiffs have failed to adequately allege a fraudulent scheme with the required particularity, as they "have not set forth specific details about the who, what, when, where, and how of the alleged fraudulent scheme." Def. Br. 12 (citing *Fresh Meadow Food Servs., LLC v. RB 175 Corp.,* 282 F. App'x 94, 97 (2d Cir. 2008); and *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)). They argue that Defendants' scheme-to-defraud allegations are insufficient because: (1) the allegations regarding NMC's alleged misstatements and omissions "do not meet the materiality threshold for mail and wire fraud," Br. 13 (citing *Moore*, 189 F.3d 165); (2) even if the misstatements or omissions were material, "the SAC does not allege that the Balboa Defendants had an independent legal duty to disclose arising from a statutory or fiduciary relationship," and (3) the allegations are insufficient to establish that the Balboa Defendants had the requisite intent to deceive or defraud. Br. 16. For the reasons discussed below, the Court disagrees.

     1.   <u>Materiality</u>

Defendants argue that the allegations in the Complaint fail to meet the materiality requirement necessary to establish a violation of mail or wire fraud: first, if they contained

misrepresentations, it is not plausible "to conclude that the letters were likely to deceive or that Plaintiffs would have responded to the notice letters differently," Br. 15; and second, if they contained omissions, the Complaint fails to allege that there was any duty to disclose. The Court concludes otherwise; it determines that, under the relevant standard, the Complaint adequately alleges that the letters sent to Plaintiffs contained misstatements and that those misstatements were material. Having determined that the Complaint has sufficiently alleged that the mailings contained material misrepresentations, the Court need not reach the question whether Defendants had a duty to disclose.

Although Defendants describe the Complaint as only alleging that "[NMC] issued materially false and misleading notices relating to LPI to borrowers via mail," SAC ¶ 263(a); Br. 14, the Complaint as a whole contains more extensive allegations regarding the materiality of the alleged misstatements. *See* SAC ¶¶ 108-114. As discussed above, and accepting as true all well-pleaded facts, Plaintiffs allege that NMC computed, prepared, and sent out the warnings and the LPI purchase notices to Plaintiffs. *See* SAC ¶¶ 108-114; Cahen Decl. Ex. 1-9. The Complaint also alleges that these letters misrepresent the nature of the amounts that would be billed -- stating that the amounts represent the "cost of the insurance" and that Plaintiffs are required to "reimburse" GMACM for having "advanced" these purported costs. The Complaint, as well as Exhibits 1 through 9 of the Cahen declaration, which the Court deems as necessarily incorporated into the Complaint, also provides specific examples of the warning letters and notices of force-placed LPI that were sent to Plaintiffs by NMC, on behalf of GMACM. These letters contain the specific statements, list the precise dates on which the letters were sent, and show to which Plaintiff the letters were addressed. Cahen Decl. Exs. 1-9.

At this stage, these allegations are sufficient to allow for a reasonable inference that the

21

letters purported to represent the amount that GMACM had actually paid, i.e., the actual cost it had incurred in purchasing LPI, that the price listed in the letters to Plaintiffs did not represent the actual cost of the LPI to GMACM, that the listed cost was higher than the cost they purported to be, and that, as a result, Plaintiffs were billed amounts in excess of what they would have been billed had the listed cost actually been what it purported to be.  The allegations specify the relevant statements in the letters, identify the speaker (NMC on behalf of GMACM), explain why Plaintiffs contend that the statements were fraudulent, and contain the date that the mailings were sent as well as the addresses of the recipients and senders, Cahen Decl. Ex. 1-9, as required under Rule 9(b).  *See DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 234-35 (E.D.N.Y 2010) (collecting cases in which RICO claims were sufficient under Rule 9(b) and noting, among other things, that these sufficient complaints listed the specific "different mailings said to contain fraudulent representations, along with the dates of these mailing" (citing, *inter alia*, *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999))).

Contrary to Defendants' assertion, this case is distinguishable from *Gustafson v. BAC Home Loans Servicing, LP,* No. SACV 11-915, 2012 WL 7071488, at *6-7 (C.D. Cal. Dec. 26, 2012), and *Weinberger v. Melon Mortg. Co.*, No. CIV.A. 98-240, 1998 WL 599192, at *4-5 (E.D. Pa. Sept. 10, 1998).  In *Gustafson*, the court concluded that the plaintiffs had not satisfied Rule 9(b) because their "neutral" and "sweeping allegations" did not allege with any specificity "*when* these frauds occurred," *which* "Defendants committed the alleged predicate acts," or "*what* the false statements were."  2012 WL 7071488, at *2-3, *6-7 (quoted italics in original). Here, on the other hand, Plaintiffs' claims are alleged with particularly, specifying the dates the letters were sent, what role each Defendant played, and what the specific misstatement in the letter was (the actual cost Defendants had incurred in purchasing LPI).  In *Weinberger*, the court

22

concluded that none of the acts in the alleged scheme to "deceive plaintiffs into allowing their

insurance to lapse so that [Servicer] could charge [Insurer's] higher rates," could be reasonably

calculated to deceive, as the warning letters and notices had specifically stated that the force-

placed insurance was a more expensive product that would not protect the plaintiffs' interests

and urged plaintiffs to purchase their own hazard insurance. 1998 WL 599192, at *5-6. In the

current case, on the other hand, Plaintiffs do not allege that the fraudulent scheme was intended

to misrepresent the nature of LPI or trick them into lapsing on their payments. Rather, the

alleged scheme here is more simple: that "costs" and "reimbursements" listed in the letter as

legitimately owed were materially overstated.

Finally, to the extent that Defendants argue that Plaintiffs cannot show materiality

because they would not have altered their behavior, Br. 14-15, such argument runs contrary to

the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.*, which held that

"RICO's text provides no basis for imposing a first party reliance requirement." 553 U.S. 639,

666 (2008). Moreover, although a jury may ultimately determine that the statements were, in

fact, immaterial to Plaintiffs, the Court cannot make this speculative determination at this point

in the proceedings or conclude that the statements were immaterial as a matter of law. *C.f.,

Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 235 (2d Cir. 1987).

### 2.   Intent

Defendants next argue that Plaintiffs' Complaint does not allege the existence of a

scheme to defraud because it fails to demonstrate that the Balboa Defendants had the intent to

deceive. Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of

a person's mind may be alleged generally," *see* Fed. R. Civ. P. 9(b), the Second Circuit has

cautioned that courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement

regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito v. IMCERA Grp. Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990)); *accord In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009). Accordingly, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994); *accord Mills,* 12 F.3d at 1176; *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991); *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir. 1990). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *Acito,* 47 F.3d at 52.

Accepting Plaintiffs' well-pleaded allegations as true, the Court concludes that they have adequately established that Defendants had the requisite intent to deceive or defraud. Plaintiffs allege that the Balboa Defendants, and particularly NMC, as the agent for BIC/MIC issued Plaintiffs materially false and misleading notices relating to LPI so that GMACM could incorporate that data into its monthly statements, remittance reports, servicing reports, and annual certifications, which were, in turn, sent to Plaintiffs by mail and electronic wire. Moreover, Plaintiffs allege that: (1) BIC/MIC received LPI payments from GMACM; (2) BIC/MIC transmitted portions (or percentages) of these LPI payments, termed "commissions," to the third-party, John Doe, who then sent these funds back to GMACM; and (3) BIC/MIC transmitted money to NMC via "intercompany expense allocations," to covertly pay the costs of NMC's services to GMACM.

Taken together, these allegations provide a sufficient basis upon which to infer that the

24

Balboa Defendants had a motive for committing fraud and a clear opportunity to do so. As alleged, GMACM was the fifth largest mortgage servicer in the nation -- servicing over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion -- and chose to purchase its LPI exclusively from BIC/MIC. Plaintiffs plausibly allege that this was as a result of the companies' "*quid pro quo*" relationship: in exchange for GMACM purchasing its LPI from BIC/MIC, BIC/MIC would covertly pay for NMC to act as a subcontractor for GMACM and would return a portion of GMACM's LPI cost to GMACM as a kickback. It is fair to infer from the facts alleged that Defendants had a strong financial interest in maintaining their relationship with GMACM, that they knew that the actual costs of LPI for GMACM were lower than the amounts that were being asserted in the letters sent to Plaintiffs, and that they sent the notices containing the material misrepresentations. *See Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 267 (E.D.N.Y. 2011) (collecting cases where courts concluded that fraudulent intent had been sufficiently pleaded based on a "motive shared by all defendants to induce" the injured party to pay inflated bills). Additionally, the manner in which the Balboa Defendants expensed and paid for the alleged kickbacks "constitute[s] strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *Acito,* 47 F.3d at 52.

Accordingly, the Court concludes that Plaintiffs' allegations adequately give rise to a strong inference of intent, as required, and that Plaintiffs have sufficiently alleged the existence of a scheme to defraud. As such, the Court moves on to the second element, "[D]efendants' knowing participation in such a scheme." *MLSMK Inv. Co.,* 737 F. Supp. 2d at 142 (quotation marks and citations omitted).

       3.    <u>Participation</u>

Defendants' final argument with regard to the mail and wire fraud predicate acts is that

Plaintiffs have failed to allege adequate specific facts showing that BIC/MIC or NMC directly participated in the allegedly fraudulent transmissions. Br. 17. Specifically, Defendants argue that the Complaint does not allege that BIC/MIC was responsible for sending or determining the content of the LPI notices or billing statements, or for determining the rate GMACM would charge borrowers for LPI, and it does not allege that NMC was the party responsible for the content of the notices that were sent out. Br. 17.

The Second Circuit has "construed [the mail fraud statute's] causation requirement liberally." *Abramovich v. Oliva*, No. 11 Civ. 1755, 2012 WL 3597444, at \*10 (E.D.N.Y. Aug. 20, 2012) (quoting *U.S. v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998)) (alteration in original). "In order to show that the defendant 'caused' the mailing, it need only be shown that he acted 'with knowledge that the use of the mails will follow in the ordinary course of business,' or that 'such use can reasonably be foreseen, even though not actually intended.'" *Tocco,* 135 F.3d at 124 (citation omitted) (quoting *Pereira v. U.S.,* 347 U.S. 1, 8-9 (1954)). "[I]t is not significant for purposes of the mail fraud statute that a third-party, rather than defendant, wrote and sent the letter at issue, provid[ed] . . . the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *U.S. v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir. 1989); *see also Abramovich,* 2012 WL 3597444, at \*10.

The Court has already detailed the alleged scheme to defraud and will not repeat the allegations here. The Court concludes from those allegations that Plaintiffs have sufficiently pleaded that NMC knowingly and directly participated in the scheme and actually sent the mailings at issue. *See In re Sumitomo Copper Litig*, 995 F. Supp. at 456 (noting that in complex RICO cases "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)"). The allegations are also

26

sufficient to demonstrate that, even if BIC/MIC did not send any of the mailings, it directly

participated in the scheme and could reasonably foresee that the mails would be used in

furtherance of the same. *See Bortnovsky*, 879 F.2d at 36. Accordingly, Plaintiffs sufficiently

pleaded this element of the mail fraud violation with the particularity required under Rule 9(b).

### 4.    Predicate Acts Conclusion

Having concluded that Plaintiffs have adequately alleged the predicate offense of mail

and wire fraud, and have established at least two predicate acts, the Court need not reach the

question whether Plaintiffs have also adequately pled the remaining predicate acts -- honest

services mail and wire fraud and extortion, attempted extortion, and conspiracy to commit

extortion. *See Fischbein v. Sayers*, No. 04 Civ. 6589 (LTS), 2009 WL 2170349, at *4 (S.D.N.Y.

July 15, 2009) ("[T]he Court need not reach the sufficiency of Plaintiff's allegations that

Defendant's racketeering activity included predicate acts of money laundering . . . on this Rule

12(b)(6) motion, in light of the Court's conclusion as to the sufficiency of the pleading of

predicate acts of mail and wire fraud."). Rather, the Court now turns to Defendants' remaining

two arguments for why Defendants' RICO claim should be dismissed.

### D.    Participation in Operation or Management of the Enterprise

Defendants' penultimate argument for dismissal is that Plaintiffs have not adequately

alleged that Defendants participated in the operation or management of the enterprise. To

establish liability under 18 U.S.C. § 1962(c), a plaintiff must demonstrate that the defendant

"conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprises

affairs . . . ." Interpreting this statutory provision, the Supreme Court has held that "the word

'participate' makes clear that RICO liability is not limited to those with primary responsibility

for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO

liability is not limited to those with a formal position in the enterprise, but *some* part in directing

the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)

(emphasis in original). The Supreme Court determined that "[t]he 'operation or management'

test expresse[d] this requirement in a formulation that is easy to apply." *Id.*

    "Simply put," under that test, "one is liable under RICO only if he 'participated in the

operation or management of the enterprise itself.'" *First Capital Asset Mgmt, Inc. v. Satinwood,

Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521

(2d Cir. 1994)). "In this Circuit, the 'operation or management' test typically has proven to be a

relatively low hurdle for plaintiffs to clear," *id.* (citing *Baisch v. Gallina,* 346 F.3d 366, 377 (2d

Cir. 2003); *DeFalco v. Bernas,* 244 F.3d 286, 309 (2d Cir. 2001)), "especially at the pleading

stage," *id.* (citing *U.S. v. Allen,* 155 F.3d 35, 42-43 (2d Cir. 1998) (holding that the question

whether defendant "operated or managed" the affairs of an enterprise to be essentially one of

fact)). "Ultimately, however, it is clear that the RICO defendant must have played '*some* part in

directing [the enterprise's] affairs.'" *Satinwood, Inc.*, 385 F.3d at 176 (quoting *DeFalco,* 244

F.3d at 310) (citing *Reves,* 507 U.S. at 178-79). As such, courts in this district have consistently

held that it is "'not enough to merely take directions and perform tasks that are necessary and

helpful to the enterprise . . . or provide goods and services that ultimately benefit the enterprise;'

it is required that the 'provision of these services allow[ ] the defendant to direct the affairs of the

enterprise.'" *Aiu Ins. Co. v. Olmecs Med. Supply,* No. CV-04-2934, 2005 WL 3710370, at *8

(E.D.N.Y. Feb. 22, 2005) (quoting *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.,* 303 F.

Supp. 2d 432, 451-52 (S.D.N.Y. 2004)).

    Defendants' arguments as to participation in the enterprise are unavailing and the cases

they cite inapposite. The facts in the Complaint, accepted as true, demonstrate that the Balboa

Defendants participated in the operation or management of the enterprise itself. *See Satinwood, Inc.*, 385 F.3d at 176. Courts, including the Supreme Court in *Reves*, have consistently recognized that "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Reves*, 507 U.S. at 184; *see also Eastman v. Kodak Co. v. Camarata*, No. 05 Civ. 6384L, 2006 WL 3538944, at *4 (W.D.N.Y. Dec. 6, 2006) (concluding that allegation that defendant paid kickbacks to others in the enterprise, if true, "could certainly be found to constitute conducting or participating in the affairs of the enterprise," and collecting cases reaching the same conclusion); *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 318 (S.D.N.Y. 2000). Plaintiffs' claims against BIC/MIC easily satisfy this standard based on the kickback allegations discussed throughout this opinion.

Likewise, the allegations with regard to NMC sufficiently establish that it participated in the operation or management of the enterprise. Accepting the allegations as true, here, as in *Aiu Ins. Co.*, NMC was not a passive participant providing "services which [we]re helpful to an enterprise," *see* Br. 20, but was instead a "vital actor[] who enabled the scheme." *Aiu Ins. Co.*, 2005 WL 3710370, at *9; *compare Azrielli*, 21 F.3d at 521-22 (dismissing RICO claim against attorneys on the ground that the provision of legal services related to fraudulent transactions did not amount to management of the enterprise), *with U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 453 (concluding that *Reves* was satisfied by pleadings alleging that defendants "were key participants, by making critical misrepresentations, creating false documents and, . . . serving as the point of communication"). For the reasons discussed above with regard to NMC's overall participation in the scheme, the Court concludes that the allegations regarding NMC's role in the fraudulent scheme sufficiently demonstrate that NMC was an integral part of the overall scheme and enabled the scheme to function; it was not simply an "outside purveyor[]" who was

29

"providing services as part of its routine and legitimate business operation." *U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 453 (citing *Hottinger v. Amcoal Energy Corp.,* 89 Civ. 6391 (LMM), 1994 WL 652499, at *2 (S.D.N.Y. Nov. 17, 1994) (noting that the failure to describe the role that a defendant played in the 1962(c) enterprise with "further specificity in the pleadings does not render [the pleadings] inadequate")).

### E.    Injury

As a final ground for dismissal, Defendants argue that Plaintiffs have not alleged that the purported RICO violations were a proximate cause of an injury to Plaintiffs' business or property, as required pursuant to 18 U.S.C. § 1964(c), and that Plaintiffs therefore lack RICO standing.  Pursuant to Second Circuit precedent, among other things, "[t]o demonstrate RICO standing, a plaintiff must plead, at a minimum . . . causation of the injury by the defendant's violation." *Baisch*, 346 F.3d at 373.  The Second Circuit has developed a two-part test for making this determination: first, the plaintiff must show that the injury was "proximately caused by a pattern of activity violating 18 U.S.C. § 1962 or by individual RICO predicate acts," *Baisch*, 346 F.3d at 373; and second, "the plaintiff must have suffered a direct injury that was foreseeable." *Id.; see also Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (proximate cause showing in RICO context requires "some direct relation between the injury asserted  and the injurious conduct alleged"); *accord Hemi Grp. LLC v. N.Y.C.*, 130 S. Ct. 983, 991 (2010) (plaintiff must demonstrate "'some direct relation between the injury asserted and the injurious conduct alleged.'  A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient.") (quoting *Holmes,* 503 U.S. at 271, 274).  Defendants argue that, here, the only proximate cause of the asserted injury -- Plaintiffs payment of "falsely inflated, unauthorized LPI charges," SAC ¶ 279 -- was Plaintiffs' own failure to maintain proper hazard insurance coverage

30

for their properties. Br. 21. The Court concludes that, accepted as true, Plaintiffs have sufficiently alleged proximate cause for RICO standing purposes.

First, the facts in the Complaint regarding overbilling plausibly assert that the alleged RICO violation was the proximate cause of Plaintiffs' injury. Plaintiffs have shown a direct link between the alleged pattern of "racketeering activity" (as well as the predicate acts of fraud) and their having been billed for the inflated LPI charges. *See Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1192 (2011) ("[I]t is common for injuries to have multiple proximate causes."). Plaintiffs do not claim that they were injured by Defendants having purchased LPI, but rather by Defendants having overbilled them for that LPI; and Plaintiffs' failure to maintain insurance, though certainly the cause of their being billed for LPI in the first place, does not render moot any claim they may have with regard to the manner in which they were billed for that product.

Second, Plaintiffs have plausibly alleged that the injury they suffered was a direct and foreseeable harm, as they were at least one of the intended victims, and as the successful execution of the allegedly fraudulently scheme depended on Plaintiffs being charged for the inflated LPI, i.e., suffering the precise injury for which they are seeking redress. *See Baisch*, 346 F.3d at 374. These allegations are, at a minimum, sufficient to satisfy the pleading requirements to establish RICO standing. *See Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352, at *19 (S.D.N.Y. 2003) (addressing a motion to dismiss in a RICO claim and noting that the question whether plaintiff could ultimately prove the alleged causal link did not factor into the question whether they had sufficiently alleged that link in the complaint).

### F.    Plaintiffs Have Alleged a RICO Violation, Pursuant to 18 U.S.C. § 1962(c)

For the reasons discussed above, the Court concludes that Plaintiffs' RICO claim is sufficient to survive Defendants' Motion to Dismiss, as they have alleged with the requisite

particularity a violation of 18 U.S.C. § 1962(c). In addition, because the only remaining element

to be pleaded in support of Plaintiffs' claim under 18 U.S.C. § 1962(d) is the existence of an

agreement, and because the allegations described above plausibly allege such an agreement,

Defendants are likewise not entitled to dismissal of Plaintiffs' RICO conspiracy claim. *See*

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *see also U.S. Fire Ins.*

*Co.*, 303 F. Supp. 2d at 454; *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d at 322.

## VI.    PLAINTIFFS' RESPA CLAIM

Plaintiffs final claim alleges that Defendants' actions also violated the anti-kickback

provisions of RESPA, in violation 12 U.S.C. § 2607(a). The RESPA prohibition against

kickbacks and unearned fees relating to business referrals, 12 U.S.C. § 2607(a), makes it

unlawful "to accept any fee, kickback, or thing of value pursuant to any agreement . . . that

business incident to or a part of a real estate settlement service involving a federally related

mortgage loan shall be referred to any person." The term "settlement" is defined in the relevant

regulatory provision as: "the process of executing legally binding documents regarding a lien on

property that is subject to a federally related mortgage loan. This process may also be called

'closing' or 'escrow' in different jurisdictions." 24 C.F.R. § 3500.2.

Plaintiffs argue that "transactions relating to LPI 'regard[] a lien on property.'" Opp. 33.

As Defendants point out, this same argument has been made in, and rejected by, district courts

across the country. *See Arnett v. Bank of America, N.A.*, 874 F. Supp. 2d 1021, 1040 n.16 (D.

Or. 2012) (noting that if the first "sentence of the definition of settlement were the entirety of the

definition, [the plaintiffs] might have advanced a meritorious argument," but that the second

sentence "makes clear that 'settlement' refers to the a specific event commonly understood, in

this jurisdiction, as the 'closing'"); *Morris v. Wells Fargo Bank N.A.*, No. 2:11cv474, 2012 WL

3929805, at *15 (W.D. Pa. Sept. 7, 2012) (noting that the "[p]laintiff's contention that the force-

placed insurance was regulated by RESPA is misplaced," "RESPA regulates the receipt of fees

in connection with a real estate settlement," and "[t]he weight of authority holds that services

that are not provided as part of the settlement or closing are beyond the scope of the statute")

(citing *McNeary-Calloway v. JP Morgan Chase Bank, N.A.,* 863 F. Supp. 2d 928 (N.D. Cal.

2012) (defendants force-placing insurance upon the lapse of the borrower's coverage after the

loans had been closed did not constitute the provision of services "in connection with" the

closing of the loans); and *Lass v. Bank of America,* No. 11-10570, 2011 WL 3567280, *5-6 (D.

Mass. Aug. 11, 2011) (same) (collecting cases in support), *vacated on other grounds by* 695 F.3d

129 (1st Cir. 2012)); *Guebara v. Saxon Mortg.,* No. CIV 2:11-cv-0427, 2011 WL 1670762, *4

(E.D. Cal. May 3, 2011) ("Where the fees or charges at issue are imposed after settlement,

RESPA is inapplicable.") (collecting cases); *see also McAnaney v. Astoria Fin. Corp.*, 357 F.

Supp. 2d 578, 590 (E.D.N.Y. 2005) (allegations relating to actions that occur after the property

transfer from buyer to seller fall outside the scope of RESPA, which "was enacted to protect

consumers from unnecessary fees while purchasing a home") (citing *Flagg v. Yonkers Sav. &

Loan Ass'n, FA,* 307 F. Supp. 2d 565, 580 (S.D.N.Y. 2004)).  Defendants have provided no

authority or compelling argument to suggest that the Court should not follow what appears to be

the consensus position in district courts across the nation, and the Court sees no such reason.

Accordingly, Plaintiffs' RESPA violation, Count Three, is dismissed for failure to state a claim.

## VII.   CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss, Dkt. No. 43, is GRANTED

insofar as Plaintiffs' RESPA claim, pursuant to 12 U.S.C. § 1607(a), is dismissed for failure to

state a claim, under Federal Rule of Civil Procedure 12(b)(6).  The remainder of Defendants'

Motion to Dismiss is DENIED. The parties are to appear for a status conference on October 18, 2013, at 11:45 AM, in Courtroom 906 of the Thurgood Marshall U.S. Courthouse at 40 Foley Square, New York, New York. By October 11, 2013, the parties are to submit an updated case management plan, to replace Dkt. No. 37. This Opinion and Order resolves Docket Number 43.

     SO ORDERED.


Dated: September ___, 2013
     New York, New York

                     ALISON J. NATHAN
                     United States District Judge

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 0 3 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
LANDON ROTHSTEIN, ET AL.,                                        :
                                Plaintiffs,                       :
                                                                 :                12 Civ. 3412 (AJN)
            -v-                                                   :
                                                                 :                ORDER
                                                                 :
GMAC MORTGAGE, LLC, ET AL.,                                      :
                                Defendants.                       :
                                                                 :
-----------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

Defendants Balboa Insurance Company ("BIC"), Meritplan Insurance Company

("MIC"), and Newport Management Corporation ("NMC") move to certify for interlocutory

appeal the September 30, 2013, Opinion & Order granting in part and denying in part their

motion to dismiss. Dkt. No. 71. In particular, Defendants seek review of the Court's conclusion

that the filed rate doctrine does not bar Plaintiffs' claims. *See* Dkt. No. 72, at 1. For the reasons

that follow, the motion is granted.

## I. BACKGROUND

This is a putative class action alleging that "Defendants engaged in unlawful practices

relating to the . . . lender-placed insurance process." *Rothstein v. GMAC Mortg., LLC*, No. 12

Civ. 3412 (AJN), 2013 WL 5437648, at *2 (S.D.N.Y. Sept. 30, 2013) (*Rothstein I*). In

particular, Plaintiffs allege that (1) mortgage loan servicer GMAC Mortgage LLC ("GMACM")

"had an agreement with BIC/MIC whereby GMACM would purchase [lender-placed insurance

("LPI")] for the loans it serviced from BIC/MIC and that BIC/MIC would then provide GMACM

with kickbacks;" and (2) GMACM "bill[ed] Plaintiffs for the full cost of the LPI it had originally

1

paid to BIC/MIC, rather than billing them for the post-kickback cost that GMACM had

effectively paid for that LPI." *Id.* at *3.

On September 30, 2013, the Court issued an Opinion & Order ("September 30 Order")

granting in part and denying in part Defendants' motion to dismiss the Second Amended

Complaint. *Rothstein I*, 2013 WL 5437648. Among other things, the Court "conclude[d] that

Defendants ha[d] not demonstrated that dismissal [was] appropriate . . . pursuant to the filed rate

doctrine," finding that the doctrine does not apply where the challenged rate is one imposed upon

the plaintiffs by a third party that has acquired insurance at a filed rate, and not directly by the

insurer itself. *See id.* at *4-9 ("[T]he court cannot conclude that the amounts billed to Plaintiffs

for the cost of an insurance agreement between GMACM and BIC/MIC is 'subject to the

regulatory scheme in the same way that insurance rates are.'") (quoting *Gallo v. PHH Mortg.*

*Corp.*, 916 F. Supp. 2d 537, 546 (D.N.J. 2012); *Simpkins v. Wells Fargo Bank, N.A.*, No. 12 Civ.

0768, 2013 WL 4510166, at *14 (S.D. Ill. Aug. 26, 2013)). In the view of the Court, Plaintiffs'

allegations represented "not so much . . . a challenge to the legal rates charged, but rather . . . a

challenge to the manner in which the defendants select the insurers, the manipulation of the

force-place insurance policy process, and the impermissible kickbacks included in the

premiums." *Id.* at *6 (quoting *Simpkins*, 2013 WL 451066, at *14).

**II. DISCUSSION**

"It is a basic tenet of federal law to delay appellate review until a final judgment has been

entered." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) (citing *Coopers &*

*Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)). Section 1292(b), however, provides a limited

exception to this general rule and authorizes the district court to certify an order for interlocutory

appeal when: (1) the order "involves a controlling question of law;" (2) "there is substantial

ground for difference of opinion" as to that question of law; and (3) "immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "[D]istrict courts should 'exercise great care in making a § 1292(b) certification,'" which is generally "warranted only in the limited circumstance where 'an intermediate appeal may avoid protracted litigation.'" *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 907 F. Supp. 2d 492, 526 (S.D.N.Y. 2012) (quoting *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89 (2d Cir. 1992); *Koehler*, 101 F.3d at 866). Applying this standard, the Court finds that certification is appropriate in this case.

First, the September 30 Order "involves a controlling question of law," as required by § 1292. If the filed rate doctrine does indeed apply to amounts charged as cost reimbursements based on filed rates, even if those amounts are not themselves filed and approved rates, and are further alleged to have been manipulated to include the cost of kickbacks, then Plaintiffs' action would be barred and the case would be terminated. *Cf. Decambaliza v. QBE Holdings, Inc.*, No. 13-cv-286, 2013 WL 5777294, at *4-8 (W.D. Wisc. Oct. 25, 2013) (applying filed rate doctrine to dismiss RICO claims under these circumstances). Because reversal on this question of law "would terminate the action," it is "controlling" for purposes of § 1292(b). *Klinghoffer v. S.N.C. Achille Lauro Ed Atri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990) (citing J. Moore & B. Ward, 9 Moore's Federal Practice ¶ 110.22[2], at 268 (1990)).

The Court is not persuaded otherwise by Plaintiffs' assertion that the issue is "fact-intensive" and presents a "mixed issue[] of law and fact" or "the application of law to fact." Pl. Opp. 13-14. Although Plaintiffs point to many cases in which application of the filed rate doctrine required resolution of disputed facts, *see* Pl. Opp. 14, they identify no particular

3

disputed factual questions that "would require the Second Circuit to delve deeply into the record" in *this case*, Pl. Opp. 17. As the Court emphasized in the September 30 Order, "[t]here is no dispute that the relevant rate charged by BIC/MIC for the insurance was filed and approved," nor is there any dispute "that had Plaintiff purchased hazard insurance from BIC/MIC at these same rates, the filed rate doctrine would bar them from challenging those rates." *Rothstein I*, 2013 WL 5437648, at *6. Rather, the question is whether the "purchase and forced-imposition of the rates that BIC/MIC filed and had approved is functionally equivalent to Plaintiffs purchasing hazard insurance from BIC/MIC directly" for purposes of the filed rate doctrine, particularly where those imposed rates are alleged to include the cost of kickbacks. *Id.* This is a controlling legal question that is appropriate for interlocutory appeal.

Second, "there is substantial ground for difference of opinion" as to the question of law sought to be appealed, which is not only "difficult and of first impression," but also subject to "conflicting authority." *In re Perry H. Koplik & Sons, Inc.*, 377 B.R. 69, 74 (S.D.N.Y. 2007) (citing *In re XO Communications, Inc.*, Nos. 02 Civ. 12947, 03 Civ. 1898, 2004 WL 360547, at *3 (S.D.N.Y. Feb. 26, 2004); *Morris v. Flaig*, 511 F. Supp. 2d 282, 312 (E.D.N.Y. 2007)). The applicability of the filed rate doctrine under these circumstances presents a "nuanced question[],"*Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013), particularly in light of the absence of any Second Circuit authority on this issue. As recognized in the September 30 Order, moreover, "a number of courts in districts across the country have recently confronted this same question" and reached different results, *Rothstein I*, 2013 WL 5437648, at *6-7 (collecting cases); indeed, subsequent to this Court's September 30 Order, two courts in this district have applied the filed rate doctrine in the context of challenges to force-place insurance practices, *see Miller v. Wells Fargo Bank, N.A.*, -- F. Supp. 2d --, No. 13 Civ. 1541 (VB), 2014

4

WL 349723, at *7-8 (S.D.N.Y. Jan. 30, 2014) (rejecting argument that defendant lender "cannot rely on the filed rate doctrine because the bank is not subject to [the rate-making authority's] administrative oversight"); *Curtis v. Cenlar FSB*, No. 13 Civ. 3007 (DLC), 2013 WL 5995582, at *3-4 (S.D.N.Y. Nov. 12, 2013) (applying filed rate doctrine to bar homeowner's challenge to being billed for cost of wind coverage by his lender). Accordingly, the Court finds there to be substantial ground for a difference of opinion for purposes of § 1292(b).

Third, the Court finds that certification of the September 30 Order for interlocutory appeal "has the potential to advance materially the final termination of this litigation." *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, No. 11 Civ. 5994 (CM), 2012 WL 2952929, at *8 (S.D.N.Y. July 18, 2012) (internal citation omitted). As previously discussed, reversal on the issue sought to be appealed would result in dismissal of this litigation. Litigation in this matter, moreover, may be of long duration: Plaintiffs' motion for class certification has yet to be filed, and discovery is not set to close until 120 days after that motion is resolved, with dispositive motions due 180 days after that. *See* Dkt. No. 66. Because some of this protracted litigation might be avoided by an immediate appeal, the Court finds that the third prong of § 1292(b) has been met and certifies the September 30 Order for interlocutory appeal. *See Gulino*, 907 F. Supp. 2d at 526.

The Court's conclusion that certification is appropriate is not altered by Plaintiffs' insistence that the motion, which was filed 52 days after the order was issued, is untimely. *See* Pl. Opp. 10. As Plaintiffs acknowledge, § 1292(b) sets no deadline for certification. Pl. Opp. 10. Nor have Plaintiffs identified any cases in which a motion for certification of an interlocutory appeal was denied as untimely when filed less than two months after the order sought to be appealed. *See* Pl. Opp. 11 ("Requests made after delays of *as little as two months* have been held

to be untimely.") (emphasis added).  Defendants' motion, moreover, was filed promptly after

Judge Cote's November 12, 2013, decision in *Curtis v. Cenlar FSB*, 2013 WL 5995582, which

applied the filed rate doctrine to bar claims in the force-place insurance context.  *See* Dkt. No. 71

(filed on November 22, 2013).  Under these circumstances, the Court finds that the timing of

Defendants' motion does not mandate its denial.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED.  This resolves Docket

Number 71.

SO ORDERED.

Dated: April _____, 2014
       New York, New York

_____
ALISON J. NATHAN
United States District Judge